[Crim. No. 2093. Second Appellate District, Division Two.—September 22, 1931.]

THE PEOPLE, Respondent, v. CHARLIE MOE, Appellant.

C. J. Orbison for Appellant.

U. S. Webb, Attorney-General, and John L. Flynn, Deputy Attorney-General, for Respondent.

WORKS, P. J.—Defendant Moe appeals from a conviction under a charge of murdering Carlisle Lord and from an order of the trial court denying his motion for a new trial.

One of the points made by appellant is that the evidence in the cause was insufficient to justify the verdict against him.

Before we proceed to a discussion of that question, let us recite portions of the evidence which do not bear directly upon it but which are introductory to it. A Mr. Lassen and his wife, and Carlisle Lord, the father of Mrs. Lassen, lived together in a little house in the town of Walteria, which place is nearly fifteen miles—one witness says, with exactness, fourteen and six-tenths miles—from Long Beach. The

house had a living-room which was entered from a front porch by means of a door directly opposite a door opening into the kitchen, which latter room was in the rear of the living-room. At one side of the kitchen was a small bedroom, occupied by Mr. Lord, with a door opening from the one room to the other. There was another bedroom in the house, occupied by the Lassens.

On the evening of January 20, 1931, soon after dinner and after dark, the Lassens and Lord were engaged in playing rummy in Lord's bedroom. The latter sat on the edge of his bed and his daughter and son-in-law occupied seats at a table placed between the three. Not long after the card game was started a neighbor, Mr. Huffine, came to the front door and was admitted upon knocking, by Mrs. Lassen. He entered the bedroom but did not engage in the game, which went on between the original participants. When Mrs. Lassen admitted Huffine at the front door one of them, it is not certain which, called the other's attention to a coupe model automobile parked in front of the lot upon which the house stood, between the driveway which passed to one side of the house and a walk which led from the street to the front door. This car cuts a material figure in the question to which our present remarks are introductory, and it was observed by a number of the witnesses in the case. They all testified that it was of a dark color, they all said that it was a coupe, most of them said that it was a Ford, at least three said that it was a model A Ford, and one said that it was a 1929 Ford.

We now return to the room in which the card game was in progress. A few minutes after Huffine entered the room—probably not more than three or four—a noise was heard at the front door and Mrs. Lassen arose from her seat and proceeded thither. Through glass in the door she perceived a man standing close to it. Upon nearing the door she observed that the man had already swung open a screen in front of it and had his hand upon the knob of the door itself. Upon the door being opened this man, whom the evidence later showed was one Joe Ward, inquired whether Otto was in, Mrs. Lassen responding that no such person lived in the house. About this time Mrs. Lassen discovered a second man standing behind Ward and partially concealed by his body. This second man was

defendant Brown. Disregarding Mrs. Lassen's response about Otto, the two men advanced into the living-room, Brown having a "gun" in his hand. It may be observed here that Ward, during the proceedings which followed, so far as the evidence shows, never exhibited any weapon of any kind.

As the two men moved forward, driving Mrs. Lassen before them, she cried out, "There's a holdup here," whereupon her husband ran into the living-room through the kitchen and endeavored to push the intruders toward the front door. Brown called upon him to stop and threatened, pistol in hand, to blow his head off if he did not. Brown then struck Lassen just over the temple with his weapon, the blow dazing him to such an extent that he staggered and held his head in his hands. Immediately Ward and Brown passed Mr. and Mrs Lassen, entered the kitchen and were moving toward the open door between the kitchen and the room now occupied by Huffine and Lord, the latter having arisen to his feet. In the meanwhile Lord had procured a thirty-eight caliber revolver from near at hand—Huffine could not swear from where—and stood awaiting the invaders of the peace and quiet of his home. Firing commenced upon their appearance. Mrs. Lassen, who could see what was going on from her position in the front room, says that Brown fired the first shot. Huffine testified that Brown and Lord fired so nearly together that it was impossible to tell who discharged his weapon first. Five shots were fired in all, but an interval of a few seconds elapsed between the first two and the salvo of three. During or about this interval Mrs. Lassen passed the two men in the kitchen and fled through the back door leading from that room to the outside, calling for help, while Lassen went into the bedroom occupied by himself and his wife. Some time during the shooting Huffine crept across the bed in the room where the card game had been in progress and, escaping through a window, ran to a neighboring house for the purpose of calling the police. After the firing Brown, wounded severely by a shot through his body, ran through the house, made an exit by means of the front door, entered the Ford and was rapidly driven away by some occupant of the car. When he fled Ward was lying dead on the kitchen floor, while Lord lay on the bedroom floor mortally wounded.

He died a few minutes later. All of the facts above stated are amply supported by the evidence.

We now come to the evidence which bears more strongly upon the question whether Moe participated in the murder of Carlisle Lord. It was the theory of the prosecution that Moe drove Ward and Brown to the Lassen home in the Ford car, with a guilty knowledge of their purpose in going there, and that he drove the wounded Brown away.

We are satisfied that there was ample evidence to support a finding that some person, whether a man or a woman we do not for the present say, was seated in the car as it stood in front of the Lassen residence. This automobile we shall hereafter sometimes, for convenience, refer to as Brown's car, as there is some evidence in the record that Brown owned it, or owned a car similar in appearance to it. David F. Emery, a neighbor of the Lassens and living on the same street, heard the first two shots and immediately went to his front door and looked out. He saw a person seated in Brown's car smoking a cigarette. J. G. Andrews, another neighbor living about seventy-five feet from the Lassens and across the street, got up and "went out in front" after all five shots had been discharged and saw someone seated in the driver's seat of the car. Before the first shots were fired Bernice Webb saw a Ford car which looked like Brown's. It passed back and forth before her home and that of the Lassens, going each way twice. The first shots were fired about three minutes after she saw the car the last time. On this last appearance the vehicle was moving toward the Lassen house. Each time she saw it the car contained three persons. While the Ford was passing back and forth she saw but one other car moving along the thoroughfare. This was a large sedan. Eddie Archer was walking along the street nearly across from Lassen's home, just after the shots were fired, having heard them from a little greater distance. He saw Brown's Ford standing before the house and saw a man run from the house and get into it. After he got in the car drove past Archer and he said that there were two or three persons in it, "but I did notice that there was more than one occupant in the car".

The next appearance of Brown was at the residence of Frank J. Branson in Long Beach. He arrived, badly

wounded, on the evening of the shooting at Walteria, in a car driven by appellant. This is the first appearance of Moe under any direct evidence whatever, after the shooting. Up to this time and beginning at the moment when Brown's car drove to the door of the Lassen home the evidence against him is purely circumstantial. The vehicle in which Moe drove the wounded Brown to the Branson home was similar in appearance to the latter's car. It will at once be seen by the casual observer that this first appearance of Moe was most significant, and the latter attempted to minimize its effect by a statement he made to Malcolm Kirkpatrick, a Long Beach police officer. Brown and Moe were tried together and Brown also made a statement. No part of this statement, generally speaking, could have been considered as bearing upon the question of Moe's guilt or innocence, it not having been made in his presence, and the trial judge very properly so instructed the jury; but a part of the statement was directly brought home to Moe in his conversation with Kirkpatrick, as will presently appear. Brown said in his statement that he was wounded in Wilmington, a place some miles removed from both Walteria and Long Beach, by some men who crowded his car to the curbstone and thus stopped him. Brown said he got out of his car and was then shot by one of these men. He further said that Moe was with him at the time. This statement was taken by the police before Kirkpatrick had his conversation with Moe. After testifying that Moe's statements were free and voluntary, Kirkpatrick thus continued: "Q. Will you relate what was said at that time? A. I told him what Mr. Brown had told me about his being with him when he was over on the boulevard when he was stuck up, and so on. He says, 'That's not right.' He says, 'I was standing on the street, just got through eating in the restaurant in Long Beach, about State and Orange'—or 20th and Orange, I won't say which. And he said Brown drove up and asked him to get in and drive the car, and he said he thought Brown was drunk; and he said after he got in the car Brown told him where to drive him to and directed him to the house where we found him, which was Frank Branson's residence. Q. Did Mr. Moe say what part of the car he rode in after he met Ray Brown that night?

A. Yes; on the driver's side. Q. He said he drove the car?
A. He drove the car, yes.''

There was evidence in the record which, if the jury elected to believe it, conclusively showed that the most material portions of Moe's statement were utterly false. When Moe and Brown arrived at Branson's house Brown's car was left in the back yard of the place and remained standing there until long after the coming of the police officers who responded to calls sent them soon after the two men had arrived. Two of the officers examined the car and both found a large and fresh blood stain on the back cushion, a stain in size about three by four inches. One of the officers testified that the stain began about three inches from the middle line of the back cushion and that it was all on the side of the seat opposite that half which was behind the steering-wheel. The other officer swore that the stain was near the edge of the cushion furthest removed from the side at which the steering-wheel was located. They both testified that there was no blood on the part of the cushion behind the wheel. None of this evidence about the blood stain was contradicted. The jury was justified in finding that Brown was bleeding profusely when he entered his car after the shooting at Walteria, for there was evidence that drops of blood were later found along his course from the place of the shooting to the point at which the car stood. Brown was shot through the body, although a little to one side, as a bullet hole was present at each front and back, and he bled at both orifices even after reaching Branson's home. Taking all this evidence as a basis the jury could only have found that Brown never occupied the driver's seat of the car at any time between his departure from Lassen's house and his arrival at Branson's. It is not possible that he could have occupied the driver's seat on the long drive from Walteria to Long Beach and left no blood stain on the cushion, and that he could have left such a stain on the other end of the cushion on the short drive from one part of Long Beach to another. These two ideas are utterly incompatible.

As Moe resorted to prevarication in his assertion to Kirkpatrick that the wounded Brown drove the car to the neighborhood of Twentieth and Orange Streets, and as the uncontradicted evidence as to the blood stains shows that Brown, after he was wounded and entered the vehicle at

Walteria, never occupied the driver's seat of the car, and considering other evidence stated above, it is difficult to perceive how the jury could have avoided findings to the effect that it was Moe who sat in Brown's car in front of the Lassen home and that it was he who drove Brown from the scene of the crime at Walteria to the residence of Branson. Someone sat in the car as it stood at the curbstone, someone drove Brown away very rapidly, as the nature of his wound and as a speedy escape from the scene of the crime both required; and it must have been very hard for the jury to believe that Brown "swapped" drivers in the middle of this stream of difficulty. Under all the circumstances already stated, and under other evidence yet to be mentioned, the jury, as it appears to us, must needs have found that as Moe transported Brown to Branson's he also transported him over the entire road from Walteria. For the jury to have decided otherwise would have required too great a strain upon the credulity of humans, even if prone to error and victims of the siren song of deceit, as they are.

Moe and Brown arrived at Branson's at about 8:15 and Moe helped the wounded man into the house, where he was immediately put to bed. A physician was at once called and arrived in a few minutes. He sent Branson and Moe for some ice to be used in treating his patient and they returned with it from a near-by drug-store in five minutes or so. Several of the Long Beach police came in a few minutes later. After they had made such an investigation as they deemed proper they departed and with them took Moe to the Long Beach police station. Until thus removed Moe showed no disposition to leave Branson's premises, but sat and awaited the course of events, or sometimes moved about the house. Immediately upon Moe's arrival at Branson's he had told the householder the same fantastic fabrication he later communicated to Kirkpatrick. Under the rule that flight from the scene of a crime is evidence of guilt in its commission Moe is entitled to no credit because he loitered about the Branson household until he was taken away by the minions of the law. Having told Branson, upon his arrival, a tale by which he endeavored to picture himself as a good Samaritan, he must have deemed it to his advantage to continue the role and remain near at hand in case anything further could be done for the man he would

have us believe he had already so self-sacrificingly be-friended.

It seems proper, for several reasons, to here set down a conversation between Moe and Deputy Sheriffs Bright and Cloud. Cloud testified:

"We asked him his name, and the questions were by Captain Bright and answers by Mr. Moe. We asked him his name, his address and occupation. He gave us that. He was working at that—that he wasn't working at that time. We asked him where he was on the night of January 20th, and he said several places. We asked him to begin with in the morning of January 20th, as near as he could go over where he had been. He said that he and a man named Joe had gone to San Pedro in the afternoon to see Mr. Moe's wife; that is, Joe drove him over there in a Ford coupe, and after arriving there Mr. Moe got out of the car and stayed for some two hours and a half, and Mr.—this Joe came back after him, and they went from there to a print shop on West Eighth street, in San Pedro, where they met a Mr. Holt. Mr. Moe said he got out of the car and went into the print shop and had a few drinks with Mr. Holt, and then Mr. Moe came out and took Joe into the print shop and introduced him to Mr. Holt, and Mr. Moe didn't know the last name of Joe, so Joe told him to introduce him as Louie, and they had a few more drinks and got back in the car and went to Long Beach. He arrived there, as near as he could figure out, around dark or shortly before. Joe stopped the car in front of the poolroom at Twentieth and Orange, and Mr. Moe got out of the car and stayed around there for a while, and walked over to the poolroom at Seventeenth and State—I believe that is the address. He said he stayed around there for a while, doing nothing in particular; and from there he walked to his home. He said it took him about ten minutes to walk there. He said he arrived at the poolroom about 6 o'clock, and that he was at his room in his hotel at 6:30. We called his attention to the fact that during his travels after he got out of the car in front of the poolroom he consumed about an hour and twenty minutes—(interruption). We asked him if he had seen anyone in the hotel, and he said yes—or, rather, had anyone seen him in the hotel at that particular time, and he said yes. 'Who, the landlady?

'No, an old woman, not the landlady.' The question was, 'Did you speak to her, or her to you?' 'No, I didn't speak to her, and she didn't speak to me.' He said he stayed at his hotel for about a half an hour, or perhaps twenty minutes. He went down again to the poolroom at Twentieth and Orange street, and as he was standing out in front Mr. Brown drove by, drove up to the curbing, and says, 'Get in and drive me.' We asked Mr. Moe if anyone had seen him at that poolroom, and he said no. He said, 'I could see who was in there, but no one could see me. I looked in through the window.' He said he asked Mr. Brown what was wrong with him. He said, 'Never mind, just drive me down to where I show you.' We asked him how Mr. Brown appeared, and he said, 'He appeared to me as being drunk.' And upon Mr. Moe's entering the car Mr. Brown got over from underneath the wheel—or behind the wheel and moved over to the passenger side of the car, and he drove Mr. Brown from there to 1720 Stanton place, and got out of the car, and Mr. Moe followed him, and they went into this house that later proved to be the home of Mr. and Mrs. Branson; and we asked him if Mr. Brown had told him anything on the road, and he said only that he had been driving for about a half an hour from over in the Wilmington district. After the arrival at the Branson residence they put Mr. Brown to bed and Mr. Brown asked for a doctor to be called, and the doctor was not home. Mr. Brown asked for a doctor to be called, and the doctor was called, and Mr. Branson and Mr. Moe went after some ice and brought it back and gave it to Mrs. Branson. And about that particular time the Long Beach police came in and took Mr. Moe to the police station. We asked him if Brown told him whether he was alone or not. He said he was alone; that another car forced him over to the curbing, and when he got out he thought it was a friend that he knew, and standing alongside of the car, one of them up and shot him. Mr. Moe stated that Brown, after he got out of the car, he noticed that he was bleeding very bad. We asked him if he had noticed whether or not there were no blood spots on the cushion behind the driver's wheel. He said he knew that. We asked him if he realized that, if a man had driven half an hour, bleeding as bad as Mr. Moe said Mr. Brown was after he got out of the car, that there

must have been blood behind the driver's wheel—not just a spot that would go in less than five minutes' driving time. He said he didn't know anything about that; all he knew was he picked Brown up at Twentieth and Orange and drove him to the Branson residence."

It is to be noticed that in the statements Moe made to the two officers he included the untruthful story he had already recited to Branson and Kirkpatrick—the story to the effect that Brown had picked him up at Twentieth and Orange that Brown had moved over from the driver's seat and that he, Moe, had then driven the sufferer to Branson's. The following portion of Cloud's testimony, relating to a matter which we have already noticed, is particularly worthy of attention: "We asked him if he realized that, if a man had driven half an hour, bleeding as bad as Mr. Moe said Mr. Brown was after he got out of the car, that there must have been blood behind the driver's wheel—not just a spot that would go in five minutes' driving time." Moe's only response to this truly searching question was that "he didn't know anything about that; all he knew was he picked Brown up at Twentieth and Orange and drove him to the Branson residence." In other words, that was his story, and he would stick to it.

Moe's statement that Brown was bleeding profusely when he got out of the car is illuminating. We have already seen that the wounded man was bleeding badly—so badly that the blood ran from the bullet hole through his torso to the ground—when he got into the car as it stood before the house of murder. As he was bleeding so badly when he started on the drive from Walteria, as the blood on the right side of the back cushion of the car was the only blood on the cushion, as he was bleeding profusely when he left the car, how could the jury possibly have found that at any time on the drive from Walteria to Branson's he occupied the driver's seat?

There is a circumstance yet to be answered which bears upon Moe's story told to his four auditors, and it may be put in the form of a question. If Brown had driven so far on his way to Branson's, where for some reason undisclosed by the evidence he apparently expected to find a haven of rest, why should he have called upon a stranger to help him cover the short remainder of his journey, pain-

ful though it must have been? The answer to this question accords with what we have already said concerning the untruthfulness of Moe's story. That this worthy prevaricated is established beyond doubt by a piecing together of as nicely fitting a mosaic of circumstantial evidence as was ever constructed.

We conclude that the evidence firmly supports findings that Moe drove Ward and Brown to the place where the car stood before the Lassen residence, that he sat in the standing vehicle while his two companions did their bloody work and until the surviving one came, sorely wounded, to the car, and that he drove the stricken Brown to the Branson residence.

But appellant contends that the record fails to show that he did all these things with a guilty knowledge of the purpose of his companions. The fact that he did them all is some evidence that he was possessed of that knowledge, but we shall proceed more specifically with a discussion of the subject. Everyone fit to be a juror knows that the automobile, originally intended for a peaceful and lawful use, has become throughout the world, and especially in the United States, one of the most efficient aids to the commission of crime known to history. The auto carries the criminally minded quickly to the scene of a contemplated criminal act and aids him to get quickly away after the crime is committed or has failed of a consummation. Every juror knows that to make a quick and therefore a successful "getaway" the active perpetrators of a crime must have some person, more passive than they in his connection with the offense, occupying and in charge of the car which has brought them to the scene. This is true for the reason that the motor must be started upon the appearance of the direct perpetrators, or must be kept running during their absence. The car must be occupied by such a person to the end that it be not hemmed in by other cars if the scene be in a heavily traveled district, that no occurrence or mishap of any other character shall impair or render inefficient the instrumentality provided for a getaway, and that the occupant of the car may keep a lookout for a possible interference by the police, or for other untoward events likely to interfere with a consummation of the crime and lead to an arrest of the active participants in it, and by some concerted signal

apprise them of the danger. These passive but handy participants in the commission of crime are so necessary a part of the paraphernalia of criminal machinery that they have names which distinguish them from those for whom they act as chauffeurs, being called lookouts, lookees or doormen.

The jurors, with all this common knowledge in their possession, were well on their way to a finding that Moe acted with guilty knowledge when they considered the evidence that Moe sat in Brown's car awaiting the return of his companions from within the Lassen home and that he drove the survivor of the two to Branson's home, for with that proof, granting that the jurors considered it as proof, many pertinent reflections came to their minds, among them these:

1. No men embarked upon such a mission as that which impelled the acts of Ward and Brown would be so foolish as to rely upon a lookout who was not possessed of a knowledge of their purpose. If they did so the lookout would be rendered useless, as he could not discharge the duties of his position. Indeed, without a knowledge of what his companions proposed to do, or, at least, that they were embarked upon a criminal enterprise of some sort, he could not know that he had been ushered into such a job.

2. If, despite all this, Moe was innocent when his companions started toward the Lassen home, he must soon have learned that the entrance of the two into the house was aggressive and forced. Mrs. Lassen testified that she left a light burning on the front porch after admitting Mr. Huffine, and that it was still alight when Ward and Brown entered the place. Moe might very well have seen the pistol in Brown's hand as he stood at the door, he might very well have heard the inquiry about Otto and Mrs. Lassen's response to it, and he might have observed the persistency with which the two men entered the house despite her response. Under the evidence we think the jury could have found that Moe saw and heard all these things, for the record shows that the lot upon which the Lassen house stood was 40 by 140 feet in size. The structure, therefore, could not have been a great distance from Moe, although there was testimony that it sat back from the street a "considerable distance", whatever that may mean. If he did see and hear these things, and he was an innocent

man, the jury might have gone so far as to doubt whether he would have remained at his post. If innocent, he would have been tempted to flee the spot, either in the car or afoot, whether he yielded to the temptation or not.

3. Moe certainly heard the five shots, as they were heard by others who were much farther from the scene of conflict than was he. This fact must necessarily have impressed Moe as being more serious and calling more strongly for action on his part than anything which had preceded the firing. Whether he actually knew that the entry of Ward and Brown into the house was aggressive—a circumstance above referred to—he was sure to know that their presence in the house led to the shooting, for the reason that it followed immediately upon the entry. If he had been an innocent man—that is, innocent of knowledge of the purpose of his companions in entering the house—he would have driven away the car when the bombardment began, or would have incontinently and rapidly departed, even if afoot. But he awaited the outcome of the battle in the home, as would have been expected of him as a lookout, lookee or doorman. In short, in his every move throughout the various steps of this lamentable occurrence Moe acted exactly as a lookout would.

4. After the shooting was over, Brown came out of the house—and he ran. Moreover, he came alone. If Moe was not possessed of guilty knowledge, why did he not await the coming of Joe Ward? He had brought two men to the house. If he was innocent, why did he so readily and hurriedly depart with one? No one could have told him that Ward was to remain in the Lassen house. No one decided that question except the god of battles, if there is one. There is no doubt that he drove away in great haste. There is no conflict of evidence on that question. We cannot say that there was direct evidence that Brown said as he clambered into the Ford, "They got Joe! Step on it!" for there is no such direct evidence. But the entire circumstances of the case show that he must have said something to that effect, or Moe would not have departed so hurriedly with his passenger and without the missing Joe Ward, destined to breathe no more. Here again, as ever, Moe acted the part of the trained lookout.

5. When Ray Brown ran out of the house, apparently sole survivor, on his side, of the conflict which had been waged there, why did not Moe if he was an innocent man, and having heard the sounds of conflict, drive Brown to some public hospital or police station, so that the facts surrounding this battle which roused a neighborhood could be investigated, instead of taking him to a private residence in Long Beach?

6. Again, when further evidence of the conflict at Walteria was furnished by Moe's discovery, on arriving at Branson's and on helping Brown out of the car, that the latter was bleeding profusely, why did he not then take the latter to a public or police hospital instead of into Branson's house? This was his last chance, having passed other opportunities by, to show that he was an innocent man, although the preceding incidents were enough to inspire the conduct to be expected of a citizen free from guilt.

For a special purpose we refer to the statement of Moe made to Bright and Cloud and above set forth. We call particular attention to that portion of the statement which pertains to the trip to San Pedro which Moe took with one Joe. Moe said that he and Joe went to San Pedro in the afternoon, that Joe drove them over in a Ford coupe, that on the trip they saw a printer named Holt, to whom Joe asked Moe to introduce him as Louie, as Moe did not know Joe's last name, and that the two returned to Long Beach in Joe's car, arriving there "around dark or shortly before". It was at Twentieth and Orange that Joe let Moe out of the car.

There are several circumstances in this story which tended to show to the jury that Moe had knowledge of the purpose of Ward and Brown when he drove them to Walteria. Moe said he did not know Joe's last name. The jury was justified in disbelieving this story, for it was most unlikely, as the two men were together a good part of the afternoon, and as Joe drove Moe, evidently in Joe's car, from Long Beach to San Pedro and also on the return trip, that Moe did not know the name of the man who thus favored him. If the jury did not believe Moe its members were justified in finding that the tale was told with an ulterior purpose; for instance, to prevent evidence ever to arise that he and Joe Ward were closely associated together in the afternoon,

for it will appear in a moment that there was evidence that Moe's companion was no other than the man who fell at the hands of Carlisle Lord in the evening, within from, say, two to three hours after Joe dropped Moe at Twentieth and Orange.

Moe's statement also shows that he was willing to associate closely with a man who traveled under an assumed name and was willing to introduce him to others by that name. The jury was justified in regarding this as a suspicious circumstance. It is to be remarked here, in passing, that the evidence shows that several of Moe's acquaintances knew him under an assumed name, that of Smiley. The printer Holt testified that he knew him by that name alone. Smiley is a well-known family name, but it must be confessed that this Smiley may possibly have been so-called because he had a well-favored countenance, a smiling face; indeed, as Byron has it in "Don Juan", that

"He was the mildest mannered man
That ever scuttled ship or cut a throat",

although we think, under all the evidence, that the jury must have determined that Moe used Smiley as a family name, especially as there is no testimony that he was known as Smiley Moe.

There is another circumstance in the case which, taken in connection with Moe's statement to the officers, is most damaging to Moe's claim that it was not proven that he had guilty knowledge of the purpose of Ward and Brown in entering the Lassen home. The witness Holt was shown three photographs of Ward and identified them as "resembling" the man to whom Moe introduced him on the afternoon of January 20th. Here, then, was finally shown an intimate association between Moe and Ward from before 2 o'clock in the afternoon of the fatal day—for Holt testified that he first saw Moe in San Pedro at about 2—until about dark, when Moe says he was dropped at Twentieth and Orange, Long Beach. The jury was shown by information secured from the Weather Bureau, under stipulation, that on January 20, 1931, it was dark at 5:11 o'clock. Whether this statement referred to Los Angeles, to Long Beach or to Walteria does not appear from the record, but the three places are so close together that this lack makes no material difference. It will be observed that Moe was

dropped by Ward a little more than two hours before the killing of Lord. The conspirators—and we have now shown sufficiently that Moe was one of them—had then but a comparatively short time to prepare for the move on Walteria.

■ Appellant contends that the *corpus delicti* was not proven as to Moe. The point is made upon the contention, as stated in the brief of appellant, that "the *corpus delicti* must be established by proof of two distinct elements, to-wit: first, a criminal act and, second, the accused's agency in the production of said act". Points similar to this have been made many times in California and they have never stood the test of judicial examination. It must be proved in every criminal case, of course, that the defendant was an agent in the commission of the offense which is the basis of the charge made against him, but the proof of this agency is no part of the proof of the *corpus delicti*. This proof of agency of a particular defendant is offered to show his complicity in the commission of the offense, the *corpus delicti* having been established by other evidence. Here the *corpus delicti* was plainly shown by evidence that Lord was killed by Ward and Brown acting in concert, no matter which of the two fired the fatal shot, and no matter how many accomplices in addition to the one who did not fire the shot might be brought into the case. "The two elements of *corpus delicti* are (1) certain facts forming its basis and (2) the existence of criminal agency as the cause of them. To establish the *corpus delicti* it is not essential to show that the crime charged was committed by the defendant" (*People* v. *Flores,* 34 Cal. App. 393 [167 Pac. 413]; see, also, *People* v. *Britt,* 62 Cal. App. 674 [217 Pac. 767]; *People* v. *Rodway,* 77 Cal. App. 738 [247 Pac. 532]). "From something that is said in one of the briefs we infer that appellant entertains the view that a complete proof of the *corpus delicti* contemplates a showing that he committed the crime. If this is appellant's view he is in error in holding it. 'To establish the *corpus delicti* it is not essential to show that the crime charged was committed by the defendant' " (*People* v. *Strider,* 96 Cal. App. 632 [274 Pac. 601]). Indeed, in effect, the only question that Moe presents now is that which we have already been at such pains to discuss, the point that the evidence was insufficient to support the verdict against him.

■ It is also insisted that the trial court erred in admitting the evidence of Holt to the effect "that about 2 o'clock on the afternoon of January 20, 1931, appellant was in the printer's shop of Holt with the deceased Ward". The objection to this evidence was that it was too remote and was not connected with the commission of the murder. The point is untenable for two reasons. The first is that before Holt testified the jury had already heard, without objection, the statement of Moe, coming to them from the lips of Cloud, and relating to Moe's movements during the afternoon of January 20th. This statement was much more complete and, be it also observed, much more damaging to Moe than was the testimony of Holt. The second reason why the point now made is not tenable is that the testimony of Holt was plainly admissible, irrespective of waiver by failure to object to Cloud's testimony. Holt's testimony, taken together with Moe's statement, shows that, except for a period when Moe visited his wife, the two criminals were together from 2 in the afternoon until a comparatively short time before Lord was murdered. This latter point we have practically settled during our discussion of the question whether the evidence sustained the verdict against Moe.

■ At the trial appellant offered the following instruction, but the court refused to give it: "The court instructs the jury that as to the defendant Charley Moe there is no evidence showing or tending to show that said defendant killed or participated in the killing of one Carlisle Lord while attempting to perpetrate the crimes of arson, rape, robbery, burglary or mayhem." We think this instruction might well have been given. There is not the slightest evidence in the record, direct or circumstantial, tending to show that Ward and Brown entered the Lassen home with intent to commit any of the offenses mentioned in the proffered instruction. Indeed, an analysis of the evidence—and we have read and studied the entire transcript of the testimony with unusual care—shows strong circumstantial evidence to the contrary. Still, we think the refusal to give the instruction was harmless. The reasons for this view we shall state below.

The trial court gave the following instruction: "The court instructs the jury that if a human being is killed by any

one of several persons jointly engaged at the time of such killing in the perpetration of, or attempt to perpetrate, the crime of robbery, whether such killing is intentional or unintentional, or accidental, each and all of such persons so jointly engaged in the perpetration of, or attempt to perpetrate, such crime of robbery are guilty of murder of the first degree.'' We think the instruction should not have been given, but that it did no harm to appellant.

Let us now state the reasons for the attitude we maintain as to both these instructions. Moe was convicted of murder in the first degree and the jury fixed his punishment at imprisonment for life. He contends that the refusal to give the first of the two instructions and the giving of the second forced the jury thus to fix his punishment, whereas, if the first instruction had been given and the second had been omitted, the punishment meted out to him might have been less drastic. But the jury must either have failed in its duty or it must have been composed of persons unfit to perform jury duty if it had not found Moe guilty of murder in the first degree, irrespective of the action of the trial judge in the matter of the two instructions. We think no one can read the record of the evidence without reaching the conclusion that Ward, Brown and Moe conspired together, in cold blood, to take the life of Carlisle Lord. ''All murder which is perpetrated . . . by any . . . kind of wilful, deliberate and premeditated killing . . . is murder of the first degree'' (Pen. Code, sec. 189). And the evidence in the cause shows, without substantial conflict, that the acts of the conspirators have brought them within this language. The only defense made by Moe was that of alibi, but the evidence he produced was so conflicting within itself as to render the whole worthless. There were five witnesses on this subject. The testimony of one of them fixed Moe at a place and during a time which, if the testimony was true, rendered the testimony of all the others false; or if the four testified truly the one testified falsely. Also, taking the testimony of the four, so far as the record discloses, there was a conflict as to each with the other three. This latter circumstance is affected by the fact that the record is practically barren of showing as to the distances between points at which Moe was located by the different witnesses at different times,

especially as the times fixed were all close together and as the record tends to show that Moe proceeded from one place to another on foot. We cannot perceive how the jury could have determined that Moe could have gotten from place to place in time to be where each witness said he was when the witness saw him.

In the face of such strong evidence of guilt we think the evidence offered to prove an alibi was so conflicting and unsatisfactory within itself that the jury could not have fathomed it. It furnished no substantial conflict with the evidence of guilt.

■ The trial judge refused to instruct the jury as follows: "The court instructs the jury that before you can find the defendant Charley Moe guilty of the crime charged you must find beyond a reasonable doubt and to a moral certainty that the defendant Charley Moe was present and participated in the alleged murder as charged, and if you find from the evidence that the defendant Charley Moe was not present and did not participate in the alleged murder of said Carlisle Lord you should find the defendant Charley Moe not guilty."

The judge gave the following instruction: "The court instructs the jury that the defendants Ray Brown and Charley Moe are jointly charged with the crime of murder. Before you can find the defendant Charley Moe guilty as charged you must find beyond a reasonable doubt and to a moral certainty that the defendant Charley Moe, together with one or more of the perpetrators of the alleged homicide, did, prior to said homicide, enter into a conspiracy to enter the home of Carlisle Lord with felonious intent, and if there is no evidence of such conspiracy and the defendant Charley Moe did not inflict the mortal wound upon said Carlisle Lord or cause the same to be inflicted upon him, then the court instructs the jury that you should find the defendant Charley Moe not guilty."

The one of this pair of instructions which was given rendered the refused one nugatory. Moreover, the latter was properly refused because the clause contained in it to the effect that "you must find beyond a reasonable doubt and to a moral certainty that the defendant Charley Moe was present and participated in the alleged murder as charged", if given, would probably have been construed

by the jury to mean that it must find that Moe "was present" in the place; that is, in the Lassen house, and at the time when Carlisle Lord was shot down. There was no evidence of such a state of facts, nor was the trial opened with such a theory.

Appellant complains that the trial judge erroneously refused to give and erroneously gave various other instructions. These points are either disposed of by what we have said above concerning Moe's guilt under the facts, or the refused instructions were covered by instructions given.

 In his reply brief appellant insists that the jury could not have found him guilty without basing inference upon inference, without piling conjecture upon conjecture, and cites in support of his position the case of *People* v. *Smith*, 55 Cal. App. 324 [203 Pac. 816]. The opinion in the cited case was written by Presiding Justice Finlayson, formerly of this court, and is a classic upon the subject to which it relates, but it has no application here. In the present case the rule so carefully analyzed and applied in *People* v. *Smith, supra,* was not infringed. Each element necessary to establish the guilt of Moe was shown by the record and the jury was not called upon to base inference upon inference. Each element, in other words, was *proved* by the evidence, although it was circumstantial, and the point now made by appellant is no more than an arraignment of the principle that a man may be convicted of crime upon that kind of evidence. We need venture no more upon this subject, however, as the argument of appellant is, in effect, determined by what we have said upon the question of Moe's guilt under the facts.

Judgment and order affirmed.

Thompson (Ira F.), J., and Craig, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 7, 1931, and the following opinion rendered thereon:

WORKS, P. J.—It appears to be necessary to give some extended consideration to the voluminous petition for a rehearing in this cause. The paper is specious and might mislead our higher court upon the application for hearing

before that tribunal which is sure to be made, if its inaccuracies were not exposed by ourselves, who have taken, of necessity, a long period of time in reaching a conclusion upon the merits of the cause. We may perhaps aid the Supreme Court because it is so strictly limited by law as to the time it may consume in passing upon petitions for hearings before it.

It may be said here, as a preface to what we shall say later and in order to accentuate the discussion presented in our main opinion, that this crime with which we have dealt was what is generally known as a ''gang'' murder—a killing by gangsters. This truth stands out clearly from the record. No other conclusion can possibly be reached under the evidence and counsel for appellant of course know that the assertion is correct, for they heard the evidence and have diligently studied it since its transcription. We did not make the assertion in our former opinion for the reason that the nature of the crime seemed so plain as not to require the giving of a specific name to it, but it may not be so obvious to one who has not read the record in the case.

Counsel still argue so strenuously that the evidence was insufficient to support the verdict that we must dwell for a moment upon the question as to what motivated the tragic events which occurred on January 20th of this year at the little town of Walteria. We said in our opinion heretofore rendered, in commenting upon an instruction that the trial judge refused to give: ''There is not the slightest evidence in the record, direct or circumstantial, tending to show that Ward and Brown entered the Lassen home with intent to commit any of the offenses mentioned in the proffered instruction. Indeed, an analysis of the evidence . . . shows strong circumstantial evidence to the contrary.'' It now becomes proper to state what that circumstantial evidence was. It will be noted from the facts set forth in the opinion that when Ward and Brown entered the house in Walteria they brushed aside first Mrs. Lassen and then Lassen as if they were flies, passed them by and stalked toward the kitchen, a place in which it was not to be expected that treasure could be found. Moreover, Mrs. Lassen testified that no money was in the house, nor any portable thing of any value except a comparatively cheap

ring which she wore on her hand. The kitchen could not have been the objective of Ward and Brown, and they must have been seeking Lord, or perhaps Huffine, for the only outlet from the kitchen, except to the outdoors, was into Lord's bedroom. The direct and determined movement of the two toward the bedroom, via the kitchen—and that was the only means of ingress to the former room—would justify a belief that from some coign of vantage they had located their intended victim before entering the house. We mention Huffine in this connection because it is reasonable to believe from the evidence that the two men had seen Huffine enter the place. It will be observed that the Ford car with its three occupants, had been driven up and down the block, twice each way, before being parked in front of the Lassen house, and that Mrs. Lassen and Huffine had seen it, after parking, when the latter was admitted to the premises. At any rate, however, when Ward and Brown reached the kitchen they saw that it was Lord with whom they must deal, at least for the moment, for there he stood at bay, pistol in hand. Here is another circumstance which is worthy of mention. Huffine testified that he did not see from what place Lord produced his weapon. That place must have been near at hand, as the firearm was procured quickly, and it was possibly on Lord's person. Certainly it was within easy reach, a circumstance which tends, though perhaps slightly, to justify a belief that Lord was the intended victim, that he knew that he had been "put on the spot", and that he proposed to save his life if he could or to sell it as dearly as he must. That he did the latter is shown by the casualty list: One dead and one severely wounded, out of an enemy force of two. There is another circumstance. Both Lord and Huffine were workers along the waterfront, and in their employment they might have learned too much about the liquor traffic, for every intelligent person in Los Angeles County believes from common and persistent report that immense quantities of liquor enter Los Angeles by means of the coast at Long Beach and San Pedro or near thereto. The members of the jury might very well have been influenced by this belief, translated in their minds into knowledge, for jurors are bound to be affected by knowledge they have acquired or by beliefs they entertain merely because they are men and women who

associate with other men and women and have ears to hear. On the whole, Ward, Brown and their driver went to the Lassen house with intent to commit murder, and no other crime, their prospective victim doubtless being Carlisle Lord.

We have taken time and space properly to give name to the kind of murder this was in order to emphasize certain language contained in the opinion: "The jurors, with all this common knowledge in their possession, were well on their way to a finding that Moe acted with guilty knowledge when they considered the evidence that Moe sat in Brown's car awaiting the return of his companions from within the Lassen home and that he drove the survivor of the two to Branson's home, for with that proof, granting that the jurors considered it as proof, many pertinent reflections came to their minds, among them" those mentioned in six numbered paragraphs. The common knowledge referred to in the first few words of this quotation was knowledge concerning the use of automobiles in the present-day commission of crime and the employment of lookouts to operate them when in motion and to stand by when they are at rest. If what is contained in the quotation and in the paragraph which immediately precedes it in the opinion has an application to ordinary crimes—robbery, for instance—how much more strongly does it apply in the case of a gang murder! The annals of city life in Chicago, New York and even in Los Angeles, as depicted in the daily press, have clearly and fully informed the world of the *modus operandi* when a gang moves with sinister intent upon a racketeer or a hijacker, or upon a subordinate of either, in an automobile. In such a case there is not the slightest doubt that the driver of the car is one of the gang. So it was in the instance of Moe, as we determined, upon most satisfactory evidence, in our opinion. This having been a gang murder, how apposite is this language of the opinion: "We conclude that the evidence firmly supports findings that Moe drove Ward and Brown to the place where the car stood before the Lassen residence, that he sat in the standing vehicle while his two companions did their bloody work and until the surviving one came, sorely wounded, to the car, and that he drove the stricken Brown to the Branson residence. But appellant contends that the record fails to show that he did all these things with a guilty knowledge of the purpose of his

companions. The fact that he did them all is some evidence that he was possessed of that knowledge . . . '' In truth, ''that he did all these things'' is enough to show that he was possessed of guilty knowledge in all its blackness, and it was only out of an abundance of caution that it was necessary to ''proceed more specifically with a discussion of the subject'' and to set down the six numbered paragraphs.

Dealing with both the question whether Moe was the person who sat in the Ford car while it stood by the curb at Walteria and the question whether he was possessed of a guilty knowledge of the purpose of his companions, the author of the petition for a rehearing clings persistently to the theory that in fastening guilt upon Moe the jury based inference upon inference. The point runs through and colors practically the entire petition, and the assertion is set forth with pomp and circumstance in very many places. We are not shaken from our position by this prolixity of presentation, and we shall show in a moment, after a method which we did not exhibit in the main opinion, how the evidence proves that it was Moe who sat in the car, as we have already shown that whoever rested there was possessed of guilty knowledge. There is certainly no escape from this latter proposition. Before we go further and take up the evidence as to who sat in the car we pause to assert, granting that there was any inference whatever drawn by the jury in the matter of the two propositions, there was no more than one inference. The fact of guilty knowledge on the part of the person in the car was most satisfactorily proven. There was no inference in that regard. The *possible* inference to which we refer was upon the point as to whether Moe was the person in the car. If there was such an inference drawn it arose from all the evidence, including, especially, the abundant proof that the person in the car, whoever he may have been, was possessed of guilty knowledge.

As we have already said, however, not even that inference could have been drawn. It was proven that Moe drove Brown to the Branson home and that Brown was bleeding profusely when he arrived there. The evidence as to the blood spot on the back of the car seat is fully stated in our opinion, but the petition for a rehearing sets forth a theory concerning the cause and location of the spot which

we pause to notice. Indeed, the same theory was stated in appellant's brief, but we regarded it as so futile, as so completely founded upon imagination, that we deemed it unworthy of even a passing notice in our opinion. It now reappears with an added refulgence, and it may be well to refute it. The theory is that when, as stated in the brief and petition and as imagined by Moe, Brown picked up Moe at Twentieth and Orange, Brown moved over from behind the steering wheel of the car to the opposite side of the seat and that, in so doing, he imprinted the telltale blood stain upon the cushion. This fantastic idea is based upon the view that Brown sat at the wheel upright and that the stain was somewhat horizontally elongated and showed evidence of a rubbing from side to side. It is absurd to suppose that Brown could have sat upright at the wheel during an imagined drive by him from Walteria to where Moe so fortunately appeared, wounded and weakened by loss of blood as he was. Indeed, it is doubtful whether he could have driven a car at all. Certainly, it is doubly doubtful whether he could have driven from Walteria to Long Beach. Surely, as we have already determined, he must have left a stain on the cushion back of the steering-wheel if he had driven the car from Walteria. That the blood stain could have been made by Brown's movement away from the steering-wheel is, we think, most unlikely. One reason for this view is that the stain, according to the witness whose statement is most favorable to counsel's theory, commenced three inches from the middle line of the back cushion, therefore at a point where the wounded man was clear of the wheel, and no necessity existed for scraping against the cushion. The fact that the stain was horizontally elongated is most satisfactorily explained upon another theory than that advanced by counsel. On the long drive from Walteria to Branson's the car naturally swayed to some extent from side to side, as all cars will do even on the best of roads, and Brown's body was thus also caused to move from side to side in opposition to the movement of the car. There is yet another thing to be mentioned. No blood was found on any part of the seat of the car. If Brown had sat erect at the wheel his blood must have reached the seat. Much has already been said as to the amount of blood shed by him, but there is more testimony on the subject. Mrs. Branson testified as to the

man's condition after he arrived at her home: "Q. Did you see any blood that night? A. Yes sir. Q. Where did it come from? A. From a wound in Mr. Brown's back and one in his chest. Q. Did it drip on the floor? A. Yes sir. Q. Did you see any part of his apparel that was blood-stained? A. Yes sir. Q. Where? A. As they took it off of him. Q. Took what off of him? A. His clothes. Q. Where was the bloody region? A. It ran down—dripped down on the floor off his clothes, from both his back and his chest. Q. What did you do after Mr. Brown went to bed? A. I washed the blood up off the floor, I think, about the first thing; and gathered his clothes up and put them in the bathroom. Q. Did it drip from the front door to the bedroom? A. He came to the back door. Q. You had to wipe the blood from the back door to the bedroom? A. Yes." This testimony shows plainly that Brown's clothes were so saturated with blood that it dripped from them while he yet wore them. The only reason that no blood was found on the seat at the right side of the car was because Brown evidently pressed hard against the back cushion, a most natural thing for him to do, thus causing an absorption of the blood at that place. In the consideration of this subject it must be remembered that Brown was probably shot in the chest, the ball passing out at the back. He was the man, and not Ward, who was seen to fire at Lord at almost the same time that Lord fired at him. He doubtless faced Lord throughout the fusillade that followed, Ward, so far as the evidence discloses, never having exhibited a weapon. The point to this is that Brown's bloodshedding must have been greatest at the back, as it is common knowledge that a bullet, on entering a body leaves a small hole, and at its exit makes a large one. Thus is explained the presence of blood on the right side of the back cushion, while none was left on the right side of the seat.

There are several other items of evidence which go to complete the proof that Moe was the person who sat in the Ford car as it stood before the Lassen home. The first of these is Moe's fabrication to the effect that Brown picked him up at Twentieth and Orange. That his assertion was a fabrication is conclusively shown by the undisputed evidence as to the blood stain on the cushion of the car. That evidence shows, as we have already declared, that Brown never

drove the car to Twentieth and Orange. Moe says that he did. Why did he make the statement? Certaintly because an admission of the truth would have been harmful to him. Certainly, also, he did not make it to shield some other person who may have driven Brown to the street intersection mentioned. That degree of altruism was not to be expected of him. To say that John Doe or Richard Roe, some stranger, drove Brown to the intersection might have saved Moe, and he would doubtless have made that assertion if he had known of the blood stain and had realized the unanswerable arguments to which its presence give rise. The evidence clearly shows, then, that Moe drove Brown to the intersection named. How is it proven that Moe drove the car from Walteria? Moe was with Joe Ward the greater part of the afternoon and up to a time not long before the start for Walteria, and the evidence of their association is strong enough to prove that they were intimate acquaintances, even if they became so only on that day. But this latter is hardly to be believed. Why should Ward have undertaken the excursion to San Pedro with Moe if the two were not acquainted before? Another item: Moe admitted, nay asserted, that he was so happily located at Twentieth and Orange that he was picked up by Brown in the latter's dire need. We recapitulate:

1. Moe was with Ward, one of the murderers, during the afternoon.

2. Ward and Brown acted together in precipitating the shooting at Walteria which led to the death of Lord.

3. Some person sat in the Ford while Ward and Brown did their deadly work and drove Brown away.

4. Moe drove Brown, the second murderer, to Twentieth and Orange and thence to Branson's.

Who can doubt how the missing link in this chain is to be supplied? The association of Moe with one of the murderers before the murder, and with the other so shortly after it, alone speaks volumes. But taking all the evidence together the missing link is firmly put in its place. The evidence, though circumstantial, *proves* that it was Moe who waited in the car and who drove Brown from Walteria to Branson's. If all the circumstances do not make this proof then it is impossible to prove anything by circumstantial evidence, and that kind of evidence merely enables

jurors to draw inferences. We have never heard it said that circumstantial evidence is so limited in its operation. We have seen no case which discusses this question, but the books are full of assertions to the effect that any case susceptible of the admission of such evidence upon all the issues may be proven by that evidence. Of course there are certain rules which circumscribe the use and effect of circumstantial evidence. For instance, ''the circumstances proved must be susceptible of explanation upon no reasonable hypothesis consistent with the innocence of the accused'' .(Jones, Evidence, sec. 899). This rule has not been infringed by anything we have said, for no hypothesis consistent with Moe's innocence can be drawn from the evidence, but only the sole one that he is guilty.

We have already caused to be entered an order denying a rehearing.

Craig, J., and Thompson (Ira F.), J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 22, 1931.