[Crim. No. 4054. Second Dist., Div. Two. Dec. 13, 1946.]

THE PEOPLE, Respondent, v. BEVERLY CHARLES HILL et al., Defendants; COLBERT W. INGRAM, Appellant.

Walter L. Gordon, Jr., for Appellant.

Robert W. Kenny, Attorney General, and Alberta Gattone, Deputy Attorney General, for Respondent.

MOORE, P. J.—The question for decision is whether appellant's contention that the evidence is insufficient to support a conviction of robbery should be sustained. The case was submitted to the court without a jury on the transcript of the evidence received by the examining magistrate, supplemented by the testimony of appellant and by both of his codefendants who had pleaded guilty. A résumé of all the proof is indispensable to a fair appraisal of the conclusion here derived, to wit, that the judgment should be reversed.

### Bishop's Testimony

Defendant Bishop, called by the prosecution testified substantially:

"I was first introduced to appellant on the evening of the robbery by Beverly Hill at a drive-in on Central Avenue, Los Angeles; the latter asked appellant to drive us around town; when we entered appellant's automobile I occupied the rear seat. Hill had the gun; I saw him get it about 8 o'clock from one Cox; during our drive the gun was not displayed to Ingram, nor was it mentioned; Hill had shown it to me at the drive-in; he had it in his belt, but appellant was not present. Hill and I at that time discussed the robbery; during our drive nothing was said about getting some money by a robbery; there was no talk of a robbery in Ingram's presence; Hill gave me his gun before we entered the barroom; I pointed the gun at the bartender. Ingram remained in the car while Hill and I got out at the point where Hill told him to stop. We were in the barroom about five minutes. When we left there we returned to the car. Its motor was not running; the lights

were not on; Ingram was asleep; Hill woke him up and said 'pull away now.' Appellant switched on the lights and just before we turned the corner on Maple, Hill told him to turn them off. There was no discussion of a robbery or a holdup before Hill and I entered the barroom. After reentering the car the gun was hidden behind the seat. Ingram did not know anything about it or the robbery. I admit I told the officer today that I handed the gun to Hill when I got in the car but I made a mistake. When the officers stopped us the gun was down under the back of the front seat where I hid it, in a space between the left front door and the front seat."

### Testimony of Officer Hugh R. Hill

Officer Hill testified that as the car conveying defendants came around the corner without any lights he pulled his own car "in ahead and into them" and ordered them to stop, whereupon Bishop and Hill alighted. After ordering appellant to pull closer to the curb he then "turned around and pulled in back of them." On asking appellant for his driver's license he "seen him sliding something down across his lap . . . and I just seen the butt of a gun." He identified People's Exhibit A as the same article. After handcuffing the prisoners he interrogated them concerning the revolver. He asked appellant "how come he was sliding it across his lap, trying to hide at the time I walked up to the car." Ingram denied all knowledge of the gun. Bishop told the witness that he had got the money he carried in a crap game and that he had never seen the gun. Defendant Hill stated that he did not know the gun was in the car and had not seen it. Ingram had only 40 cents on his person.

### Testimony of Officer Lambert

Officer Lambert was called to testify concerning his conversation with each of the defendants on the morning of their arrest. His testimony as to appellant's statement follows:

"He stated he had met Bishop and Hill at the drive-in at 42nd and Central about 10:30 on the night of the 28th; that Hill showed him an automatic stuck in the belt of his pants. At that time they were inside the drive-in. Then he took a boy home—or rather, he took a boy to work and came back. Then Hill asked him to ride him around a bit, and Hill put five gallons of gas in the car and Bishop put two gallons of gas

in the car, and they drove around for quite a while down around Watts. And coming back Bishop said, 'Take Main Street.' So they drove down Main Street and passed where the holdup was. Bishop said to Hill as they passed this bar, 'Well, here we are.' They circled the block, went up over on Broadway, then went around a couple of blocks, made a left turn and came back. He said he drove over on a side street and Bishop told him to park, then Hill and Bishop got out and Hill said, 'Hold everything until we get back.' So he said he sat down and was almost asleep, and they came back and said, 'Take off.' So he started up and left, but he left in such a rush that he forgot to turn his headlights on. And he said the police stopped them about half a block and at that time Bishop was fooling around in the back seat with something; he didn't know what it was. That was about the substance of the conversation at that time.''

## Appellant's Testimony

Having testified concerning the call of Bishop and Hill at the drive-in, of their request that he drive them around for a while to find some girls, of their visit to Watts and return to 31st and Main Streets, appellant testified under cross-examination substantially as follows:

''It was between 8 and 9 o'clock when I met up with Hill and Bishop at the drive-in. I had known Hill six or eight months. I had been with him in his car on a previous occasion looking for girls. The car I drove I got from a garage where my uncle works; I did not know the owner. Hill first mentioned taking a ride; he said, 'Come on boys. Let's go out in Watts to see if we can pick up some girls'; Bishop was then sitting in Hill's car which was out of fix. It was parked at the drive-in but not next to my car. I had never driven Hill around before. I did not see Hill's gun at the drive-in. I did tell Officer Lambert that I had seen the gun at the drive-in; but I was mistaken; they had me all upset. I lied to the officer; they just had me so frightened. I did not see the gun at any time prior to our arrest.

''I drove around the block in which the bar was located and as we passed the bar Bishop said, 'There it is'; I did not know what he meant; I paid no attention; I did not ask his meaning. Right after that I parked the car around the corner from the bar about 50 feet. Hill told me to park. He said, 'Stop here and wait until I come back'; I did not ask where

he was going; he did not tell me; I did not ask why he wanted me to stop, neither did he tell me; they left the car and I remained in it; I shut off the motor and turned off the lights and went to sleep. They were gone 15 or 20 minutes, maybe not that long. I do not know that they ran back to the car. When Hill woke me up they were at the car. When Hill wakened me he said, 'Come on boys. Let's go.' I did not see the gun until the officer found it in the car; I did not put the gun behind me on the front seat. I switched on my lights and Hill told me to turn them off. I did not ask why; I had done nothing to cause me to conceal my license number; I did turn them on after Hill and Bishop got back in the car. I told the officer that I took off so fast that I forgot to turn them on or something of the kind.''

### Testimony of Beverly Hill

Defendant Hill called by appellant testified:

''On the evening of November 28, 1945, my automobile was in disrepair. Willis Bishop and I met appellant at a drive-in on Central Avenue. We asked him to drive us to Watts to look for some girls. We made no mention of an intention to hold up any place. I had my gun in the waistband of my trousers but never once did I or Bishop in any conversation mention the weapon or refer to any robbery. On returning from our drive to Watts we directed appellant to stop about 50 feet from the cafe at 31st and Main Streets. Sometimes on special occasions I wear a gun when I go out; that evening was such an occasion. My car was out of fix and I intended to rob somebody else's car that night and take some parts. While at Watts Bishop and I walked away from Ingram while he sat in the car. We discussed the plan and made up our minds to commit a robbery after we could find no girls but told appellant nothing of the decision. When we stopped at 31st and Main Streets neither Bishop nor I told appellant of our purpose to rob; we left Ingram in the car while we visited the cafe where Bishop with my gun robbed the bartender. I left the barroom while Bishop was collecting the money; I preceded Bishop on the return to the automobile. I found the motor silent, the headlights dark and Ingram asleep. I sat beside appellant and told him Bishop and I had done something wrong and by rushing him made him nervous. After we had started the engine with some difficulty Bishop arrived and occupied the rear seat. Pursuant to my orders to 'pull

away now' appellant switched on the lights and proceeded east on 31st Street; after a half block I told Ingram to turn off the lights. Near Maple Avenue we were stopped by the police, whereupon Bishop threw the gun on the front seat and he and I jumped out leaving Ingram alone. At no time did either Bishop or I tell Ingram we intended to rob or that we had a gun.''

### The Evidence Applied

█ It is to be observed that there is not a word of testimony that appellant had previous knowledge of the felonious purpose entertained by his two guests. The only possible support for his conviction must therefore be found in reasonable inferences deducible from the testimony and the circumstances. The incriminating circumstance was appellant's driving the men to the cafe and waiting in his automobile while they visited the place.

By all the evidence favorable to the state's contention nothing was established but a suspicion of appellant's guilt. The testimony of the People's witnesses is devoid of act or word that may be interpreted as competent proof of a crime. If the trial court had believed the two convicts and appellant, the latter's conviction could not have resulted for they completely exculpated him. If it disbelieved them, as of course it was privileged to do, a conviction was out of the question, for the record discloses that the total of the state's evidence is wanting in the essentials of proof of an established crime. To suspect an accused is the privilege of prosecutor, judge or layman when he has been found in the company of criminals. But to put the brand of infamy upon a person because he has been brought to the bar can find no justification in law or morals. To do so is to disregard legal principles long cherished. Appellant entered the courtroom clothed with the presumption of innocence which shielded him until his guilt was established beyond a reasonable doubt. (*People* v. *Martinez*, 57 Cal.App. 771, 774 [208 P. 170].) This could have been done only by substantial proof that he knowingly assisted the robbers to accomplish their purpose or to escape detection after he had gained knowledge of the crime.

The attorney general has cited many authorities (*People* v. *Simpson*, 66 Cal.App.2d 319 [152 P.2d 339]; *People* v. *Soffer*, 34 Cal.App.2d 301 [93 P.2d 183]; *People* v. *King*, 7 Cal. App.2d 672 [46 P.2d 798]; *People* v. *Hopkins*, 125 Cal.App.

457 [13 P.2d 975]; *People* v. *Moe,* 116 Cal.App. 740 [3 P.2d 354, 4 P.2d 234]; *People* v. *Jaggers,* 120 Cal.App. 733 [8 P.2d 206]) in support of the judgment. None of them is apropos. In each instance the driver of the car conveying the criminals was proved to have participated in the fruits of the crime or to have wilfully aided the perpetrators in their attempt to escape detection. The argument quoted from *People* v. *Moe,* 116 Cal.App. 740, 751 [3 P.2d 354, 4 P.2d 234], was merely a defense of the jury's finding of the driver's guilt under the facts of that case and was not intended as a rule to govern courts and juries in every action against the chauffeur of a bandit.

The presumption of innocence must be weighed along with the evidence in deriving a verdict (*Dodson* v. *United States,* 23 F.2d 401, 402). Complicity in the crime cannot be guessed but must be based upon substantial evidence sufficient to convince an unbiased mind to a moral certainty. (*Dodson* v. *United States, supra.* See *People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778].) The genesis of the doctrine of presumption of innocence lay not in a design to protect the guilty but in a zeal to prevent conviction of the innocent. (*Nanfito* v. *State,* 136 Neb. 658 [287 N.W. 58, 63].) Where the facts of a case are doubtful the presumption is sufficient to turn the scales in favor of an acquittal. (*Burk* v. *State,* 216 Ala. 655 [114 So. 72].)

In the light of the foregoing we turn to a consideration of whether appellant was a principal in the crime by virtue of abetting the actors. To be an abettor one must have instigated or advised the commission of the crime or have been present for the purpose of assisting in its consummation. (*State* v. *Hart,* 186 N.C. 582 [120 S.E. 345].) Although a man is present while a robbery is perpetrated, if he takes no part in it or does not act in concert with the criminals he is not a principal. (*Burrell* v. *State,* 18 Tex. 713, 732.) He must render aid to the actor to render him an abettor. (*State* v. *Epps,* 213 N.C. 709 [197 S.E. 580, 583].) Also, there must be proof that not only did he aid the actor but that at the same time he shared the criminal intent of him who actually committed the offense. (*People* v. *Terman,* 4 Cal.App.2d 345 [40 P.2d 915]; *People* v. *Yee,* 37 Cal.App. 579 [174 P. 343]; *People* v. *Armentrout,* 118 Cal.App.Supp. 761 [1 P.2d 556].)

Even if there were a common unlawful purpose between the actual criminals and the person accused of abetting their

deed, to make the latter guilty his acts must have been done in pursuance of the criminal scheme; and it must be established that not only was the accused present but that he actively aided and encouraged the felons, and that he did so with knowledge of the felonious intention. (*Combs* v. *Commonwealth*, 224 Ky. 653 [6 S.W.2d 1082]; *Mowery* v. *State*, 132 Tex.Crim. 408 [105 S.W.2d 239]; *Steen* v. *State*, 125 Tex. Crim. 653 [69 S.W.2d 144].) █ The mere presence of the accused at the scene of the crime does not essentially establish his guilt as an abettor. Of course it is elemental that one who keeps watch during the commission of the crime to facilitate the escape of the criminal is guilty as a principal. But evidence of his mere presence without showing his preconcert with the actors is insufficient as proof of guilt.

The judgment is reversed with instructions to dismiss the information.

McComb, J., and Wilson, J., concurred.