[Crim. No. 822.  Second Appellate District, Division Two.—November ⸳ 25, 1921.]

## THE PEOPLE, Respondent, v. RAYMOND W. SMITH, Appellant.

[1] CRIMINAL LAW—MURDER—KILLING BY POISONING—CONTENTS OF STOMACH—EVIDENCE—INSUFFICIENT IDENTIFICATION.—In a prosecution of a husband for the alleged poisoning of his wife, it was prejudicial error to admit evidence of the finding of cyanide in a stomach which was not legally identified as the stomach of the defendant's deceased wife.

[2] ID. — PERFORMANCE OF AUTOPSY ON BODY — CONCLUSION OF WITNESS.—In such prosecution, an objection to a question asked a physician as to whether he had performed an autopsy upon the body of defendant's wife should have been sustained on the stated ground that it called for the conclusion of the witness, where the physician had not known the deceased in her lifetime

and there was no evidence of identification of the body as that of the deceased wife.

[3] ID.—HEARSAY EVIDENCE OF IDENTIFICATION—INSUFFICIENT FOUNDATION FOR ADMISSION.—The testimony of such physician that he had been told by an attendant in the undertaking establishment that the body was that of defendant's wife was hearsay, and insufficient to lay the foundation for the introduction of the contents of the stomach taken from such body.          .

[4] ID. — VEGETABLE CONTENTS OF STOMACH — CORRESPONDENCE WITH VEGETABLES FOUND ON PREMISES—INSUFFICIENT CIRCUMSTANCE FOR INFERENCE.—The testimony of the mother of defendant's wife that she found in the "cooler" of her daughter shortly after her death certain vegetables which corresponded with those which the physician had testified he had found in the stomach he analyzed was not sufficient to constitute even a circumstance from which it might be inferred that the stomach was that of her daughter.

[5] ID.—IDENTITY OF PERSON FROM IDENTITY OF NAME—PRESUMPTIVE RULE INAPPLICABLE.—The rule that identity of person may be presumed *prima facie* from identity of name is not applicable as to the identification of a stomach taken from the body of a person whom the physician removing such stomach did not know and who was unknown to the attendant of the undertaking establishment representing the body to be that of a person of a certain name.

[6] ID.—CAN OF CYANIDE—FAILURE TO CONNECT WITH DEFENDANT.— The admission of a can of cyanide which was kept in a room where defendant was employed, to which room the defendant and other employees had access, was prejudicial error, in the absence of a showing of knowledge on the part of the defendant of the existence of the poison and in view of the fact that the top of the can when removed by detectives a few days after the wife's death was covered with a heavy coat of dust.

[7] ID.—CIRCUMSTANTIAL EVIDENCE—CONNECTION OF FACTS WITH DEFENDANT.—If circumstantial evidence is introduced in a criminal case to connect the defendant with the criminal act, the circumstantial facts themselves must be connected with the defendant or they will be incompetent as evidence.

[8] ID.—LACK OF AFFECTION—ILLICIT RELATIONS—LETTER OF DEFENDANT TO WIFE.—A letter written by the defendant to his wife about a year and a half prior to her death in which he stated that he did not love her as a husband should and that he had had illicit relations with other women was admissible, regardless of its remoteness and of the fact that the parties had become reconciled after a separation which existed when the letter was received.

[9] ID.—MATERIALITY OF TESTIMONY.—Upon the trial for murder of husband or wife, evidence tending to show illicit relations of the accused with another is admissible to show lack of love and affection for the defendant's lawful spouse.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Sidney N. Reeve, Judge. Reversed.

The facts are stated in the opinion of the court.

Anderson & Anderson and E. S. Patterson for Appellant.

U. S. Webb, Attorney-General, Arthur Keetch, Deputy Attorney-General, and John W. Maltman for Respondent.

FINLAYSON, P. J.—Defendant, who was charged with the murder of his wife, Mary Edla Smith, was convicted of murder in the first degree, was sentenced to life imprisonment, and now appeals from the judgment and from an order denying his motion for a new trial.

The evidence is entirely circumstantial. The theory adopted by the prosecution at the trial was that the alleged homicide was perpetrated by means of cyanide administered by defendant to his wife on or about March 14, 1921, at their home at Bell Station, a suburb of Los Angeles. The principal points made for a reversal are that the court erred (1) in permitting the prosecution to give evidence of the contents of a certain stomach in the absence of legal evidence to identify it as the stomach of defendant's deceased wife; and (2) in permitting the people to put in evidence a certain can of cyanide found in a part of the establishment where defendant was employed.

On the afternoon of Monday, March 14, 1921, the body of defendant's wife was found in a sitting position in a chair in the living-room of her home at Bell Station. The remains were immediately removed to an undertaking establishment conducted by one G. G. Wheat at Huntington Park, a small town near Los Angeles, where the body was embalmed and prepared for burial. The following day defendant and the mother of the deceased requested that the body be taken to an undertaking establishment in Los Angeles conducted by a man of the name of Brown. Wheat testified that the body was "removed by Mr. Brown," supposedly the Los Angeles undertaker. What became of it after it was "removed by Mr. Brown" is a matter that is left by the evidence in the airy regions of

speculation. Dr. Wagner, the county autopsy surgeon, who had not known Mrs. Smith in her lifetime and probably had never heard of her before her death, called as a witness for the prosecution, was permitted to testify, over defendant's strenuous objection, that he had performed an autopsy "upon the body of Mary Edla Smith" at "the morgue of W. A. Brown, Los Angeles," on March 15, 1921. This witness further testified that, from the body of the person whom he referred to as "Mary Edla Smith," he had removed the stomach, a part of the liver, the spleen, and the left kidney. The doctor testified that he placed these organs, unwrapped, in a pasteboard box and delivered the box and its contents to Professor Arthur R. Maas, a chemist and toxicologist, who, for five years or more, had been doing work for the county coroner's office. Professor Maas testified that he received from Dr. Wagner, on March 15, 1921, a pasteboard box which Dr. Wagner told him contained the stomach of Mary Edla Smith, which name the witness wrote upon the box. Professor Maas then took the box to his office, where he subsequently opened it, discovering therein a stomach only, wrapped in paper. The contents of this stomach he subsequently analyzed, finding in it a mixture of sodium cyanide with possibly some potassium cyanide, together with pieces of potato and bread, some vegetable matter which the witness decided was pickle, and some seeds which he decided were tomato seeds.

[1] It was upon the contents of this stomach that the entire case for the prosecution rested. It was the sole basis for Dr. Wagner's opinion that the person from whose body it was taken had died of cyanide poisoning. It was the sole basis for the evidence given by Professor Maas and the other experts who testified as to the character of the stomach contents. Defendant's counsel repeatedly, but ineffectively, objected to the introduction of any evidence respecting the contents of this stomach upon the ground that no evidence had been introduced to identify it as that of Mary Edla Smith, of whose murder defendant was accused. If there was no legal evidence to identify it as the stomach of defendant's deceased wife, then, manifestly, to permit the prosecution, over defendant's timely objections, to introduce evidence of its contents was not only error but highly prejudicial error. That there was no such

identifying evidence is made clear by the testimony given by Dr. Wagner and others, as the following will show.

[2] There was no direct evidence that the body of defendant's wife ever reached Brown's undertaking establishment. Wheat testified, as we have seen, that the body was removed "by Mr. Brown." That is the sole evidence as to what became of the body after it was taken by Wheat to his establishment. But aside from this manifest hiatus in the identifying testimony, there is no legal evidence that the body upon which Dr. Wagner performed the autopsy was that which had been removed from Wheat's place. Though Dr. Wagner had not known Mrs. Smith in her lifetime, the only evidence as to the identity of the body from which he removed the stomach, spleen, a part of the liver and the left kidney is that given by Dr. Wagner himself, to whom, on direct examination, this question was propounded by the district attorney: "I will ask you whether you performed an autopsy upon the body of Mary Edla Smith." Counsel for defendant immediately objected to the question upon the ground that it called for the conclusion of the witness, in that there was no evidence that the witness ever knew Mary Edla Smith. The objection should have been sustained. At the time when the question was propounded to Dr. Wagner, no evidence whatever, hearsay or otherwise, had been adduced to show that the body was in fact that of Mary Edla Smith. In the course of the doctor's cross-examination, that witness, as we presently shall show, did give hearsay evidence to the effect that the person from whose body he removed the stomach was Mary Edla Smith. But, as we have just stated, at the time when the district attorney propounded to Dr. Wagner, on his direct examination, the question to which defendant's counsel made the objection last noted, no evidence of any kind whatever had been given or suggested to show that the witness had any knowledge of the identity of the person concerning whose stomach he was asked to testify. This notwithstanding, defendant's objection was overruled, and the witness answered the question in the affirmative, saying, in effect, that he had performed an autopsy on the body of Mary Edla Smith at the morgue of W. A. Brown on March 15, 1921. On his cross-examination Dr. Wagner testified as follows: "Q. Now, all you know as to this being the body

of Mrs. Smith was what somebody told you, was it? A. Certainly. Q. Who told you? A. The undertaker—yes, the undertaker. Q. The undertaker? A. Yes. Q. You have no knowledge on earth except what was told you by the undertaker. A. No, sir. Q. Which undertaker told you? A. It was not the undertaker himself either. It was one of the attendants. Q. Who was he? A. Mr. Taylor, I think it was, at the time. Q. And so far as you know, that is you never had seen her·before? A. I had not. Q. And you have never seen the body since? A. No, sir. Q. And never talked with any other person, except this undertaker, who knew the identity of that particular body? A. I did not." Neither the "Mr. Brown" nor the "Mr. Taylor" referred to by the witness was called to the stand. The sole evidence, therefore, tending to identify the stomach whose contents were examined by the experts was this testimony of Dr. Wagner that one Taylor, an attendant in Brown's undertaking establishment, had told him that the body upon which he operated was that of Mrs. Smith. This testimony was hearsay—that and nothing more; and was manifestly insufficient to lay the foundation for the introduction, over defendant's objection, of the contents of the stomach regarding which Dr. Wagner and Professor Maas testified.

[3] Dr. Wagner, who did not personally know the deceased, in the nature of things could not personally know that the body was that of Mary Edla Smith. Consequently, his testimony that an attendant in Brown's undertaking establishment had told him that the body was that of Mrs. Smith could only place before the jury the statement of one, not under oath, who, being absent, could not be subjected to the ordeal of cross-examination. There is no evidence whatever that Taylor, the attendant from whom the doctor received the hearsay information, ever knew the deceased or that he had any means for knowing that the body which he pointed out to Dr. Wagner as that of Mary Edla Smith was in fact the body of that person. That the question propounded to Dr. Wagner asking him whether he had "performed an autopsy upon the body of Mary ˙Edla Smith" called for hearsay evidence, that is, evidence "which does not derive its force solely from the credit to be given to the witness himself, but rests, also, in part, on the

veracity and competency of some other person'' (1 Green-
leaf on Evidence, par. 99; 1 Phillips on Evidence, 169),
is as self-evident as any truism.  The general rule, subject
to certain well-established exceptions as old as the rule itself
—applicable in civil cases, and, therefore, to be rigidly en-
forced where life or liberty is at stake—was stated in *Queen*
v. *Hepburn*, 7 Cranch (U. S.), 290, 295 [3 L. Ed. 348, see,
also, Rose's U. S. Notes], to be "that hearsay evidence
is incompetent to establish any specific fact, which fact is
in its nature susceptible of being proved by witnesses who
speak from their own knowledge."  The facts of the pres-
ent case, in so far as the identification of the body rests
upon hearsay, bear a striking analogy to those presented
in *Hopt* v. *Utah*, 110 U. S. 574 [28 L. Ed. 262, 4 Sup. Ct.
Rep. 202, see, also, Rose's U. S. Notes].  What was said
by Mr. Justice Harlan in that case is equally applicable
here, and for the reasons there so lucidly stated, the iden-
tification of the stomach concerning which Dr. Wagner and
Professor Maas were allowed to testify must be held to
be incomplete, and the evidence as to its contents must
be held to have been erroneously admitted.

[4]   The fact that the mother of the deceased found in the
"cooler," shortly after the death of her daughter, certain
vegetables which corresponded with those which Professor
Maas testified to having found in the stomach that he
examined does not rise to the dignity of a circumstance
from which it may reasonably be inferred that the stomach
was indeed that of Mrs. Smith.  These vegetables are very
common articles of diet, and doubtless could be found in
the stomachs of a large percentage of persons in every
community.  There is nothing so peculiar about this fare
that it should furnish any reasonable basis for the identi-
fication of this "hearsay stomach"—if we may borrow the
felicitous phrase employed by counsel for appellant to
characterize that portion of the human anatomy concerning
which Dr. Wagner and Professor Maas were permitted to
testify.

[5]   It is falteringly suggested by the attorney-general,
but, to his credit be it said, not insistently urged, that,
peradventure, the case falls within the rule that iden-
tity of person may be presumed *prima facie* from identity
of name.  That is, it is suggested that, in some vague way
not made clear to us, the identity of this stomach is es-

tablished *prima facie* by the application of the rule that
a presumption of identity of person arises from an identity
of name. It is too clear for argument that this rule of
evidence can find no room for application here. The rule
would have been applicable if, for example, Dr. Wagner
had testified that he knew a woman of the name of Mary
Edla Smith, and that he had removed the stomach from
the body of that person; for, under such a supposititious
state of facts, there would be a *prima facie* presumption that
the person whom Dr. Wagner had known as Mary Edla
Smith, and from whose body he removed the stomach after
death, was the same Mary Edla Smith who, in her lifetime,
was the wife of this defendant. But Dr. Wagner did not
know Mary Edla Smith. He made no pretense of ever
having known or seen a person reputed to bear that name.
Nor is there any evidence that Taylor, the attendant at
Brown's undertaking establishment and Dr. Wagner's sole
informant, ever knew any person of the name of Mary
Edla Smith. There is no evidence that Taylor possessed
any knowledge whatever that might tend to identify the
body which he pointed out to Dr. Wagner as that of Mrs.
Smith. It follows, therefore, that the testimony of Dr.
Wagner that it was Mrs. Smith's body from which he took
the stomach is based on rank hearsay, and clearly was in-
admissible.

[6] It was error to permit the state to introduce, over
defendant's objection, the can of cyanide. For some months
prior to the date of the alleged homicide a can of cyanide
had been in the filing-room of the company for which de-
fendant was working as a truck driver. This room was
used by the company as a place for the filing and grinding
of saws and other tools. The mill foreman, called as a
witness for the prosecution, testified that the can of cya-
nide was kept in a corner of the filing-room, and that it
was put there a little over a year before by one C. A.
Ward, the company's filer. The witness further testified
that he saw the can in its place in the corner of the filing-
room four or five days after the alleged homicide; that he
then removed it and gave it to the detectives working on
the case; that at that time there was dust—lumber dust
and dirt dust—a sixteenth of an inch thick covering the top
of the can; that a work bench runs up to within two or

three feet of the corner where the can was kept; that the can sat on a shaft-bearing, twelve inches from the floor, and that the bench is considerably higher than the can's resting place. The witness testified that he had seen defendant come in and go out of the filing-room at a time when the latter was repairing trucks, but would not say when it was that he thus saw the accused go in and come out of the room, stating that he could not fix the time within six months. Upon this showing the trial court, over defendant's vigorous objection, admitted the can of cyanide in evidence as an exhibit for the prosecution.

Without doubt, it is the general rule that evidence that the accused had in his possession the means to commit the crime, or had an opportunity to do so, is ordinarily admissible when the evidence against him is entirely circumstantial. In applying this rule, however, caution should be exercised to avoid giving any undue significance to circumstances that are but the ordinary incidents of everyday life. The fact that the very existence of a prosecution tends to throw suspicion upon every act of the accused and to cause "trifles light as air" to assume the appearance of "confirmations strong as proofs of Holy Writ" should give pause to any heedless imprudence in the admission in evidence of circumstances that are barren of incriminating significance. As is well said by the learned author of Wharton's Criminal Evidence (volume 2, section 915), "circumstances, trivial in themselves, take on an exaggerated character the moment that suspicion is directed toward a person accused of a crime; and because of this tendency, no circumstances should be admitted that cannot be shown to have a direct and obvious relevancy to the crime charged." That the introduction of the can of cyanide as an exhibit for the prosecution was highly prejudicial cannot be gainsaid for a moment; but that it in any appreciable degree tended to show that the defendant used any of its poisonous contents to do away with his wife must be denied. The attenuated circumstance that a can such as this, behind concealing obstructions, was in the corner of a room used by defendant's employer as a filing-room, and to which the company's employees, including defendant, had access, with no evidence whatever that defendant ever saw the can or had any knowledge that it was in the room, is not sufficient

to justify the inference that he availed himself of this possible means for administering poison to his wife, particularly when we consider that the top of the can, at the time when the mill foreman saw it, some four or five days after the supposed homicide, was covered with dust to the depth of one-sixteenth of an inch. It was not shown that the defendant had any more connection with this can of cyanide than he would have had with a similar can sitting on a drug-store shelf. [7] If circumstantial evidence is introduced in a criminal case to connect the defendant with the criminal act, the circumstantial facts themselves must be connected with the defendant, or they will be incompetent as evidence. (*People* v. *Kennedy,* 32 N. Y. 141.) There was nothing that connected this defendant with the can that did not equally connect all of his coemployees therewith; and if the presence of the can in the corner of the filing-room attached any suspicion to defendant, it equally implicated all the other employees who had access to the room.

Unless it be shown that defendant had knowledge of the presence of the can in the filing-room, its existence there is a circumstance of no evidentiary value whatever. That defendant, at any time, had knowledge of the existence of the can is a matter of pure conjecture. But the fact that an accused person had an opportunity to commit the crime with which he is charged is of itself only a circumstance, from which, with other circumstances, guilt may be conjectured or inferred; and it is the established rule that an incriminating circumstance from which guilt may be inferred must not rest on conjecture. It is not permissible to pile conjecture upon conjecture. We cannot build one inference upon another. (*United States Cement Co.* v. *Whitted,* 46 Ind. App. 105 [90 N. E. 481].) " . . . one conjecture cannot be treated as a proved fact in order to reach another conjecture." (*Cohn* v. *Saidel,* 71 N. H. 558 [53 Atl. 800].) "An inference of fact," says the author of the article on evidence in Corpus Juris, "should not be drawn from premises which are uncertain, but the facts upon which an inference may legitimately rest must, it is said, be established by direct evidence as if they were the very facts in issue." (22 C. J., p. 84. See, also, *United States* v. *Ross,* 92 U. S. 281 [23 L. Ed. 707, see,

also, Rose's U. S. Notes] ; *Thayer* v. *Smoky Hollow Coal Co.,* 121 Iowa, 121 [96 N. W. 718], and 2 Chamberlayne on The Modern Law of Evidence, sec. 1029.) In *Thayer* v. *Smoky Hollow Coal Co., supra,* the court, employing the word "presumption" in the sense of an inference of fact, said: "But it is said that from the evidence to which we have referred it should be inferred that defendant had knowledge of the defect. This, it seems to us, is pushing the doctrine of presumptions at least one step too far. . . . A presumption can arise only from facts actually proven by direct evidence. A presumption is not a legitimate foundation for a presumption. If this were not true, there would be no limit to conjecture." Were the rule otherwise, the very defect of proof which renders it necessary to call in the aid of one collateral circumstance would equally inhere in the other collateral circumstance, and the infirmity which attached to the one would attach to the other. It would, said Chief Justice Denio in *People* v. *Kennedy, supra,* be "like the blind leading the blind." The rule, as stated by the New York court in the Kennedy case, is that circumstantial evidence "consists in reasoning from facts which are known or proved, to establish such as are conjectured to exist; but the process is fatally vicious if the circumstance from which we seek to deduce the conclusion depends itself upon conjecture." For these reasons we are of the opinion that the evidence of the presence of the can of cyanide in the filing-room was too remote from the point in issue to have any probative force, and that its admission in evidence was prejudicially erroneous.

For the foregoing reasons, the judgment and order denying defendant's motion for a new trial must be reversed. The assignments of error, however, present at least one other question of importance, which, as it is likely to arise upon another trial, we deem it proper to examine.

[8] The court overruled defendant's objection to the introduction of a letter written by him and mailed to his wife about August 1, 1919—a little more than a year and a half prior to the latter's death. This letter, after relating how the defendant, faithless to his marriage vows, had had adulterous intercourse with a number of women during the years of his married life, continues as follows: "I haven't the heart to talk any more about it. Enough to

say I hope you hate me so bad by now that you will be glad you found out before your whole life is gone and it is too late. You can still enjoy life by forgetting me entirely, as I don't think you will ever see me again. I hope not. . . . I will try and send you some money as soon as I can pay off the bank. In the meantime get a good job and forget me forever. I don't love you as a husband ought to and I don't think you can love me after reading this far. Don't try to find me as you can't do it for any benefit to either of us.''

It seems that defendant and his wife had separated three or four times prior to the alleged homicide, the last separation taking place about a year before that event and continuing for about three months. Thereafter they became reconciled, and, for some months immediately prior to the wife's death, apparently were living together in peaceful and harmonious relations.

Appellant's objection to the introduction of the letter is based upon the ground that, because it was written somewhat more than a year and a half prior to the alleged homicide, and because, some time subsequent to its writing, a reconciliation had ensued, the letter was too remote, in point of time, to have any legal bearing upon the issues. We think that this ground of objection goes to the weight rather than to the admissibility of the evidence. (See *People* v. *Brown*, 76 Cal. 573 [18 Pac. 678], and *People* v. *Wilson*, 23 Cal. App. 513, 521 [138 Pac. 971].) Moreover, the letter was not introduced to show that the couple had previously quarreled. The purpose of its introduction doubtless was to show that, according to its admissions, defendant's whole nature and make-up is such that he probably did not bear toward his wife that love and affection which ordinarily may be looked for in a true and steadfast husband. Indeed, in the letter defendant directly and explicitly confesses that he does not love his wife as a husband should. [9] No rule is more firmly established than that, upon the trial for murder of husband or wife, evidence tending to show illicit relations of the accused with another is admissible to show lack of love and affection for the defendant's lawful spouse. (*Porter* v. *State*, 173 Ind. 694 [91 N. E. 340] ; 21 Cyc. 918.) Even though a reconciliation between defendant and his wife may have been

effected some time prior to the wife's death, the fact that the letter, though written by defendant on August 1, 1919, contains a confession of his adulterous disposition and a lack of love for his wife has some legitimate bearing upon the case in that, in some degree, however slight, it is a circumstance going to show that defendant would have been more likely to commit the crime than if he were a loyal and loving husband. (See *Porter* v. *State, supra.*) For these reasons we think the letter was admissible.

There are other questions discussed in appellant's brief, but as they probably will not present themselves upon a retrial of the case, we deem it unnecessary to comment upon them.

For the reasons given, the judgment and order denying defendant's motion for a new trial are reversed.

Works, J., and Craig, J., concurred.