[Crim. No. 2388. Second Appellate District, Division Two.—February 20, 1934.]

THE PEOPLE, Respondent, v. SIDNEY T. GRAVES, Appellant.

(1)

Jerry Giesler, Randall & Bartlett and Kenneth W. Kearney for Appellant.

U. S. Webb, Attorney-General, John L. Flynn, Deputy Attorney-General, Buron Fitts, District Attorney, and Frank Stafford, Deputy District Attorney, for Respondent.

STEPHENS, P. J.—The defendant in the trial court, the appellant here, was tried before a jury upon the accusation contained in the indictment about to be set out. The jury found, the accused guilty, and after a motion for a new trial had been made and denied the accused prosecuted this appeal from the judgment and from the denial of the motion for a new trial.

The indictment is as follows:

"The said Sidney T. Graves is accused by the Grand Jury of the County of Los Angeles, State of California, by this indictment, of the crime of bribery, a felony, committed as follows, to-wit: that the said Sidney T. Graves on or about the 7th day of February, 1930, at and in the County of Los Angeles, State of California, did wilfully, unlawfully, corruptly and feloniously receive and agree to receive a bribe from Felix Kahn, Allan MacDonald, Charles R. Ross, MacDonald & Kahn, Inc., a corporation, Fisher-Ross-MacDonald & Kahn, Inc., a corporation, John Doe, Richard Roe and Jane Doe, a sum of money, to-wit, Eighty Thousand Dollars ($80,000.00) lawful money of the United States, upon the agreement and the understanding that his official vote, opinion, judgment, and action should be influenced thereby and should be given in a particular manner, to-wit, to vote in favor of the acceptance by the Board of Supervisors of the County of Los Angeles, acting *ex officio* as the Board of Supervisors of the Los Angeles County Flood Control District, of a certain compromise and claim which was then and there offered to be made and demanded by the said Felix Kahn, Allan MacDonald, Charles R. Ross, MacDonald & Kahn, Inc., a corporation, Fisher-Ross-MacDonald & Kahn, Inc., a corporation, John Doe, Richard Roe and Jane Doe, and the payment of the sum of Eight Hundred Thirty Thousand Seven Hundred Sixty-five and 90/100 Dollars ($830,765.90) by the said Los Angeles County Flood Control District to the said Fisher-Ross-MacDonald & Kahn, Inc., a corporation, Felix Kahn, Allan MacDonald, Charles R. Ross, MacDonald & Kahn, Inc., a corporation, John Doe, Richard Roe and Jane Doe, which said offer of compromise and claim and payment were then and there pending before and to be considered by the said Board of Supervisors of the County of Los Angeles, then and there *ex officio* acting as the Board of Supervisors of the Los Angeles County Flood Control District, the said Sidney T. Graves and the other members of the said Board of Supervisors being then and there the duly elected, qualified and acting Board of Supervisors of said County of Los Angeles."

The supervisors of the county of Los Angeles are *ex officio* supervisors of the Los Angeles County flood control district. The defendant (appellant) held the office of supervisor of

Los Angeles County all through the several years in which the flood control district was actively considering the construction of a large dam in the San Gabriel Canyon of the Sierra Madre Mountains. As a practical method of attending to the various kinds of business duties falling upon the board, it created committees or departments, each supervisor being the chairman of a committee. The chairman gave his particular attention to the specific business assigned to his committee or department. One of these committees handled or paid particular attention to the flood control business and policy of the district, and was denominated the flood control and buildings committee. Appellant was the chairman of this committee and the active head of its affairs throughout the happening of the events to which we are about to turn our attention. The construction of this dam alone was a stupendous undertaking, and the "District", as we shall herein refer to the organization, was equipped with offices, employed a chief engineer and assistants, an attorney and a firm of attorneys as special attorneys. The assistance of the county counsel was also available to the district.

On the 7th of December, 1928, a contract for the construction of the dam was awarded to a group of four individuals, Claude Fisher, Charles P. Ross, Allan MacDonald and Felix Kahn, upon their bid of $11,250,040. By and with the consent of the board the contract was assigned to a corporation entitled Fisher, Ross, MacDonald & Kahn, Inc. By the use of the word "contractor" herein it will be understood that we refer to this corporation. In due time actual work began and considerable work had been done when, during the month of September, 1929, an earth slide occurred and revealed a defective rock base. Subsequent to the letting of the contract a law had been enacted requiring the consent of the state engineer for the construction of a dam of the character contemplated by the contract to which reference has been made. This consent had not been obtained before the slide occurred, but soon thereafter the state engineer was requested by the board to examine and report on the site, and thereafter and after examination said engineer withheld his approval and officially disapproved thereof. Immediately after the slide the board of supervisors, herein generally referred to as the board, notified the contractor not to proceed further, and after the state engineer's report,

formally cancelled the contract and abandoned the construction of the dam. The contractor protested and threatened suit in court for damages. The county counsel, the flood control attorney and the firm of attorneys employed as special counsel advised the board in writing that the district would not be liable for prospective damages, since the work was stopped and the dam was abandoned because the state engineer had withheld his approval and also because of the discovery through the slide that the foundation work made the dam unsafe. They also advised the board that a defense could possibly be made that the contractor knew of the fault before it bid on the job and that it withheld such information from the board. During the three months following the abandonment, negotiations for a settlement were carried on in which appellant, representatives of contractor, engineers and attorneys representing both sides, and sometimes, though not to any great extent, other members of the board, participated. These negotiations resulted in a settlement whereby the following sums for the items mentioned were agreed to be paid and were paid to the contractor, and the contract was by mutual consent at an end:

"The Settlement.

"For 83,886 cu. yds. of excavation work not paid for at the contract price of $2.95 per cu. yd. ..............................$247,463.70
Amount held back on excavation work....... 203,479.20
For work done pending settlement.......... 8,044.00
For interest and necessary expenses during part. shut down at $3000.00 per day..... 279,000.00

Total on main compromise.................$737,986.90
For buildings and equipment at site......... 92,779.00

"Grand total ...................$830,765.90"

The date of this settlement was January 30, 1930. After agreement that the compromise payments should be as just recited, and just before the official vote thereon, the contractors filed a claim against the district with the board for the sum of $4,290,459.20. At the session of the board at which the vote to compromise was taken the attorney for the contractors was asked if a claim had been filed, and

he answered, "Yes, but I do not think it is necessary to do it. The claim filed included what profit we would have made, $4,290,459.20." Contractor had already been paid $1,800,000 in progress payments on the contract. Appellant was active in the matter of arriving at a settlement. At one time he said he did not want the matter to drift into litigation. In the matter of receiving an appraisal of the buildings and materials at the site he evidenced a desire for speed by requesting a report as soon as it could be made. Just before the meeting for passage of the compromise appellant requested that the flood control attorney be informed that he need not attend the meeting. It was the usual practice for the chairman of the committee having in charge the matter before the board to move the adoption of any motion relative thereto, and in the case of the motion to adopt the compromise agreement appellant was the actor. All supervisors voted for it and all of the attorneys approved it. This covered everything but the buildings and equipment, and a warrant was duly drawn, delivered and cashed. On February 6th, after advertisement for bids (to technically cover a legal requirement), the purchase of buildings and equipment was made and a warrant for the sum of the agreement was drawn on the same day.

On the day the compromise was before the board for approval, appellant made the statement to the board that the contractors were not being paid a cent of damages. This, of course, could hardly be the fact and he could not have believed it true, for a large part of the payment was for damages through stoppage of the work at $3,000 and $4,000 per day. It also paid for a large yardage excavated outside of the paylines and therefore outside of the contract, if we take the district's chief engineer's figures as accurate. This is the state of the case at the conclusion of the compromise.

On February 7th, or the day following the payment for the buildings and material, a man in San Francisco appeared at the Crocker First National Bank and gave his name as C. E. Dutton. He produced $40,000 in currency and purchased a cashier's check payable to Alice T. Richardson; and on the same day a man appeared at the Anglo-California Bank in the same city, gave the same name and produced $17,000 in currency with which he purchased a cashier's check payable to Pearle Finch. On this same day appellant

was absent from a meeting of the board but attempted to have it recorded that he was present. On the next morning he appeared in the safety deposit department of a bank in Los Angeles, where he had a safety deposit box rented. On February 21st appellant again appeared at the safe deposit department of the latter bank and on the same day he presented the $40,000 cashier's check to the American Mortgage Company in payment of a second trust deed on the Ray Manor apartment house in Los Angeles. The note representing the indebtedness was indorsed to the payee of the check, Alice T. Richardson. The evidence further shows that the indorsement upon the check, "Alice T. Richardson", was forged by appellant. Thereafter the title to the Ray Manor apartment house was quieted in superior court against Alice T. Richardson of the $40,000 indebtedness in favor of appellant and his wife. Alice T. Richardson was at all of these times an aged invalid aunt of appellant's, living with him and his wife, and the evidence is clear that she never had any interest in this check nor the funds it represented. The evidence further shows that the $17,000 check drawn to Pearle Finch was deposited on the said twenty-first day of February to the account of Pearl E. Finch (variation in name intended) at Hermosa Beach, after the signature of the payee had been forged by appellant. Thereafter $13,146 of this money was paid by appellant in discharge of an encumbrance on another apartment house the title to which stood in his and his wife's names, and thereafter $3,853.40 thereof was placed in the bank account of appellant's wife. Pearl E. Finch was also a relative of appellant, and it is clear that she never had any interest in the check nor the money it represented.

On the day the two cashier's checks were purchased in San Francisco for a total sum of $57,000 in currency, the firm of MacDonald & Kahn (interested in the contract) withdrew from their account in the Wells Fargo & Company Bank in San Francisco the sum of $80,000 in currency. The above was the status of the evidence when the state began the introduction of the testimony given by appellant under oath before the grand jury of Los Angeles County.

Appellant was subpoenaed to appear before the grand jury and there he was informed that the subject of the inquiry related to the San Gabriel dam matter. He was

questioned at length about his acquisition of the $57,000 represented by the two cashier's checks. Without attempting to detail the testimony, suffice it to say that appellant related an unbelievable story of a Mr. Dutton who had years ago been loaned as large an amount of the Graves family money as $90,000. Later appellant denied that the loan was that much. Appellant's story about Dutton was vague and general. The latter was sometimes in Vancouver, B. C., but he seems to have rarely stayed any one place long enough to receive mail. Appellant testified that he was not in San Francisco on February 7th, and that Dutton had sent or brought the cashier's checks to him in Los Angeles. The whole story was incredible, inconsistent, contradictory and upon its face a tissue of untruth so palpable that no part of it could be given any credence. The fact that appellant was in San Francisco masquerading under the name of Dutton, and that he received at least $57,000 in currency and later handled it in a way to demonstrate that he was concealing his possession of it, together with his mythical explanation of its source, constitutes a statement of fact from which no other deduction could be drawn than that the most powerful motive existed for concealing not only the possession but the source of the money. In fact, his own story, analyzed in the light of truth and reason, practically amounts to a confession that the money was ill-gotten. No evidence has been introduced and no argument or claim has been made to the trial or appellate court in contradiction of this conclusion, excepting only appellant's plea of not guilty to the indictment.

The appellant as defendant in the trial court offered no evidence, and the jury returned a verdict of guilty. In the course of the trial Allan MacDonald and Felix Kahn, two of the original bidders on the contract and who continued interested in the assignee corporation as members of the firm of MacDonald & Kahn, were sworn and refused to testify upon the ground that their testimony might tend to incriminate them. They were also subpoenaed to bring the books of their corporation, but they stated from the witness-stand that they had not done so because they were not in possession of them. All of the testimony regarding the withdrawal of $80,000 in currency from the bank by MacDonald & Kahn was objected to by appellant upon the ground that it was

irrelevant and not in any way connected with him. The objection was overruled. Of course, the case was prosecuted upon the theory that the currency withdrawn from the bank by MacDonald & Kahn, or at least $57,000 thereof, was delivered to appellant in payment of a corrupt agreement between the contractor and appellant as to the settlement hereinbefore detailed. The attitude of appellant as to the objection just referred to is well expressed in his opening brief on appeal, as follows: ''The evidence disclosed that the contracting firm of MacDonald & Kahn at that time was apparently accustomed to dealing with large sums of money. They had received but recently this settlement from the county of Los Angeles, amounting to almost a million dollars. Is it unreasonable to assume, while we are discussing guesswork, that an $80,000 withdrawal even in currency might not necessarily be anything unusual for a firm accustomed to doing business in amounts of this magnitude? How could the jury say that this money was not withdrawn for any other reason that might suggest itself to one's mind?''

All of the evidence as to the testimony of appellant before the grand jury was objected to on the ground that it was an extrajudicial statement and could not be admitted as the *corpus delicti* had not been laid. This objection was also overruled.

Appellant advances five points in his claim for reversal of the conviction. The first one is the point above made as to the withdrawal of the currency from the bank. The second one is the point above made as to the *corpus delicti*. The third is that the evidence is legally insufficient to establish the *corpus delicti*. The fourth is that the evidence was and is legally insufficient to establish venue in Los Angeles County. The fifth is that the court erred in refusing certain instructions on circumstantial evidence. We shall discuss these assignments in their order.

## I.

*Was the testimony as to the $80,000 properly admitted?*

■  In the approach of this question we are mindful of the fact that this case is one of first impression, in a sense. Both the state and the appellant assert in their briefs that they have been unable to discover any case in the books

where the issues in a bribery case have depended as largely on circumstantial evidence as does this one. Neither side asserts that a bribery case under such conditions cannot successfully be presented, but both tacitly admit that great difficulty is encountered. As this exceptional quality of the case bears heavily upon the point at hand, we shall enter at once upon its consideration.

A study of cases shows a confusion in the minds of some courts between the admissibility of a circumstance in evidence and its weight when admitted. Of course, a circumstance may be so remote as to be of no practical use and should therefore be held inadmissible, but every case must be considered in its own right, and if extreme remoteness is not apparent the circumstance should be admitted and its weight left to the jury. Again, a circumstance may, when introduced, seem very remote, but when considered with the other evidence both direct and circumstantial it may bridge a gap in the evidence. Two cases are never exactly alike. They may indeed have great similarity and yet be just different enough for the same fact in evidence to be extremely significant in one and useless in the other. It would appear, therefore, that the examination of analogous cases can help but little in questions of admissibility of circumstantial evidence, and perhaps less in the process of measuring the weight of such evidence.

In the old case of *Rex* v. *Burdett,* 4 B. & Ald. 123, we find this quotation: ''Until it pleases Providence to give us means beyond those our present faculties afford, of knowing things done in secret, we must act on presumptive [circumstantial] proof, or leave the worst crimes unpunished.'' The theory upon which evidence of circumstances is admitted as evidence in the trial of a case is not that each circumstance stands flawless in its proof of the ultimate fact, but that each certain circumstance has a relation to and points reasonably to the fact sought to be proved. ''The question [of admissibility] is not as to the value or strength of the testimony, but whether it can afford any rational inference in connection with the other evidence in the case, as to the point under investigation. Though certain testimony offered may appear to be vague by itself, and altogether inconclusive, and apparently irrelevant, it may be made certain in its character, and plainly relevant, by other

facts in proof. If a case turns on a great variety of circumstances, facts seemingly unimportant when separately considered may assume importance when considered in connection with others. And so no evidence relevant to the issues can be rejected on the ground that, unassisted by other testimony, it will not establish the point in issue.'' (3 Ency. Ev., p. 113.)

Burrill, in his treatise on circumstantial evidence, at page 193 thereof, treats of the use of circumstantial evidence as follows: ''And the intrinsic character of the facts themselves, enables the jury to deal with them as they would with a similar body of facts affecting their own private interests, where the conclusion necessary to be formed would be one upon which some important action of their own was to be founded. It was well remarked, in a late important case (*Commonwealth* v. *Webster*, Bemis' Rep. 466, 59 Mass. 295 [52 Am. Dec. 711]), that 'the common law appeals to the plain dictates of common experience and sound judgment, and the inference to be drawn from all the facts must be a reasonable and natural one'.''

It would seem, then, that in the process of unfolding the evidence in the trial of the instant case, the proof of which by its very nature depends almost wholly upon circumstances, the fact of the withdrawal of the large amount of currency would be admissible evidence and its weight would be affected largely by its relation to other circumstances. This fact would be very important when joined with the fact that immediately following the payment on the compromise, appellant went to the city wherein the contractors maintained their headquarters and there became possessed of a large sum of money in currency, and acting under an assumed name disposed of it as hereinbefore shown. Notwithstanding the argument of counsel that contractors were used to handling large sums of money, the present commercial practice of transferring credit by check from bank to bank in the discharge of obligations seems to mark the withdrawal of such a large sum of currency as an unusual circumstance. We think the evidence was properly admitted as a circumstance in the unfolding of the case. (*People* v. *Getty*, 49 Cal. 581; *People* v. *McClain*, 115 Cal. App. 505 [1 Pac. (2d) 1085].)

██ We now come to the question as to whether or not the court should have granted appellant's motion to strike, made at the conclusion of the People's case, upon the ground that the evidence or circumstance was not connected with appellant. The question before us is, as we see it: Was the circumstance so remotely related to the other circumstances of the case as to be of no assistance in arriving at the truth? If this circumstance, being but one of all of the circumstances of the case, though a necessary one, and all of the circumstances including this one, point consistently toward the fact of guilt, and are not explainable except upon the hypothesis of guilt, each has borne its burden and was properly admitted and was properly left in the case for the consideration of the jury.

What other hypothesis than guilt in this case can appeal to the plain dictates of common experience and sound judgment, to paraphrase Chief Justice Shaw in the Webster case hereinbefore cited? What other hypothesis do the circumstances in this case point to? The jury had to determine the momentous question upon the evidence before it. The evidence under objections is entitled to remain in and the court was not in error when it denied the motion to strike it from the evidence if, when fitted together as a mosaic with the other circumstances or facts, it pictured guilt beyond reasonable doubt and to a moral certainty. If some of the mosaics were missing they could have been supplied by appellant himself, who, within his rights, remained silent throughout the trial. But it was within his power to supply the whole truth of the matter being inquired into. Under these conditions the law does not permit him to complain if less than absolute certainty or less than demonstration, and only moral certainty beyond reasonable doubt is taken as sufficient to establish guilt. The anxiety of appellant to settle the case out of court possibly could have been explained by upright reasons but it is consistent with guilt. The desire to have the flood control attorney stay away from the meeting may have been based upon good, legitimate reasons, but the attorney had expressed his belief that no liability existed and it may be that he would have been in the way. Appellant's expression that no damages were included in the settlement would seem to have no possible explanation in truth, and it is consistent with guilt. The

facts of his trip to San Francisco the next day after payment of the compromise money and his attempt to conceal the trip may have been innocent facts, but they are consistent with guilt. His acquisition of $57,000 in currency, while his known financial condition was bad, and his handling of it through his relatives and under an assumed name may, from a strict standpoint of the possible, have been innocent of crime, but deception is an indication of crime. All of this, together with the forgery of his relatives' names, cannot point to innocence and it is consistent with guilt in this case. The drawing of a large amount of currency by those beneficially interested in the settlement on the very next day after the payment of the compromise and upon the very day appellant had a large amount of currency in hand under the related circumstances may have been for other business purposes, even though the actual handling of so much money in commercial enterprises be the rare exception rather than the rule, but it is consistent with guilt. The incredible story related by appellant before the grand jury is consistent only with some strong reason for the concealment of truth, and this is consistent with and indicative of guilt. We repeat, what reasonable hypothesis, other than guilt, could include all of these circumstances? It is, of course, true that there is no direct testimony of the alleged fact that appellant corruptly agreed to vote and did corruptly vote for the compromise. There is no direct testimony of the alleged fact that the contractors entered into the corrupt agreement or that they performed by the corrupt delivery of money; but there are circumstances present in this case, one of them being the testimony objected to, that baffle any other explanation and establish appellant's guilt to a ''moral certainty'' and beyond a ''reasonable doubt''. It is said in *Commonwealth* v. *Webster, supra,* in a passage from Chief Justice Shaw's famous charge to the jury as to reasonable doubt, ''It is not mere possible doubt: because everything relating to human affairs, and depending upon moral evidence, is open to some possible or imaginary doubt.'' Later in the same charge the Chief Justice refers to moral certainty as being ''a certainty that convinces and directs the understanding, and satisfies the reason and judgment of those who are bound to act conscientiously upon it.

This we take to be proof beyond reasonable doubt; because if the law, which mostly depends upon considerations of a moral nature, should go further than this, and require absolute certainty, it will exclude circumstantial evidence altogether." " '[T]he guilt of the accused' observes Mr. Best 'must be essentially connected with the facts proved, so as to flow from them by a species of moral necessity.' 'Moral certainty', observes the Marquis Beccaria, 'is only probability; but which is called certainty, because every man of sense (or, in his senses) assents to it necessarily, from a habit produced by the necessity of acting.' '' (Burrill on Circumstantial Evidence, p. 199.) That is, if one is willing to act upon his conclusion such conclusion is to him a "moral certainty". (See, also, Wills on Circumstantial Evidence, p. 262.)

Courts have sometimes used the expression that an inference cannot be based upon an inference and appellant has sought to apply this principle as a reason for rejecting the evidence under consideration. In the first place, the expression itself is far from an accurate one. Just as the language we speak is said to be made up of dead metaphors, so our ordinary statements as to facts are really made up of dead inferences. These inferences are so intimately associated with known or obvious facts that we habitually accept them as facts. Wigmore, at section 41, volume 1, of his treatise on evidence, says flatly, "there is no such rule, nor can be". But using the term as loosely as you please, how does it apply to the situation here? The fact is the large amount of currency was withdrawn from the bank. We know by inference from other facts that on the same day appellant had a large sum of currency in hand. We know from other facts and inferences all of the other circumstances. It is from the reasonable relation of all of these separate relevant facts each to the other that an inference of the greater fact, to wit, the corrupt agreement and its consummation, is drawn. (Wigmore, *supra*, sec. 148, vol. 1.) It seems to us that the inference that this money was in fact the same money appellant had in San Francisco, and that he got it corruptly as alleged, is just as clear and calls into play no broader inference than does Mr. Justice Storey's famous charge to the jury in Williams' Trial, a murder case, quoted from section 2081, Wigmore on Evidence. The body of the

man alleged to have been thrown into the sea was never recovered. Said the court: "The counsel for the prisoner contend to you that there is no evidence of the actual death of Baynard, that it is still possible he may have been saved by some miraculous interposition . . . But by what spirit of the deep was he protected? To what region has he been conveyed? . . . If you are satisfied with the truth of the evidence presented to you, it is impossible for you to indulge the least doubt on the point of his actual death." The ocean tide *could* have lain Baynard's body upon the silvery strand of a tropical isle where the beneficent sun *could* have successfully awakened a slumbering spark of life, but Justice Storey did not think much of the chances. The jury in the instant case was justified in thinking as little of the chances that some beneficent spirit of finance stuffed $57,000 in bills in Graves' empty pockets. We think the court was not in error when it denied the motion to strike the evidence.

We have examined all of the cases cited by appellant and as we have indicated, they have not convinced us that the motion to strike should have been granted. We shall here but briefly notice those most relied upon by appellant. Before we do this, however, it will be well to very briefly mention that the two cases, *People* v. *Getty* and *People* v. *McClain,* heretofore cited, are cases wherein evidence of coins and of a certain number of $100 bills found on defendants and corresponding to the missing property was admitted as proof that the possessors had stolen them. The possession of these coins and of these bills was hardly more remarkable than the withdrawal of this large amount of currency and the finding at practically the same time of a large amount of currency in appellant's hands under all of the circumstances heretofore related. It must also be remembered throughout this discussion that the contractors are not here on trial. Had they been, the evidence might well have been of a different scope. The evidence that appellant sought to have stricken is a circumstance as to appellant's guilt in connection with facts directed against appellant only. The force of this statement will be seen in our analysis of the case of *People* v. *Bissert,* 71 App. Div. 118 [75 N. Y. Supp. 630], hereinafter cited.

*People* v. *Coffey,* 161 Cal. 433 [119 Pac. 901, 39 L. R. A. (N. S.) 704], and *People* v. *Davis,* 210 Cal. 540 [293 Pac.

32], are both cases turning on the proper corroboration of accomplices. The point for decision in these cases was not the admissibility of circumstantial evidence. This is plainly seen by a reading of section 1111, Penal Code, ''A conviction cannot be had on the testimony of an accomplice unless he is corroborated by other evidence which in itself, and without the aid of the testimony of the accomplice tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it *merely shows* the *commission* of the *offense* or the *circumstances thereof.''* (Italics ours.)

*People* v. *Mullen,* 69 Cal. App. 548 [231 Pac. 588], and *People* v. *Smith,* 55 Cal. App. 324 [203 Pac. 816] : In the Mullen case a person had been robbed and the victim had given evidence of identification of the defendant as an accomplice of the robber. As the police intercepted the defendant he was riding in an automobile with another man against whom no evidence was given and against whom no charge had been made. This man threw a revolver in the back of the car as the officers intercepted them. This revolver was shown as an exhibit to the jury. It was held error for the reason that no evidence connected the revolver or knowledge of the revolver with the defendant. The court refused to apply section 4½, article VI, of the Constitution, saying, ''We have made an examination of the entire cause, including the evidence, and are satisfied that if it cannot be said, as we do not find it necessary to say, that the evidence is totally deficient, it must be said that it is lamentably weak and unsatisfactory.'' Had the evidence been convincing that the man who tossed the revolver was the man who did the robbing, the ruling would most probably have been different.

In the case of *People* v. *Smith,* 55 Cal. App. 324 [203 Pac. 816], Smith was being tried for the murder of his wife. It was the theory of the prosecution that the defendant had administered cyanide. A can of cyanide was found in a corner of a saw-filing room on a shelf. Defendant had access to and occasionally went into this room. When seen on the shelf a few days after the death of defendant's wife, the can was covered with one-fourth inch of dust and filings. No evidence was offered that defendant had ever touched it or knew of it. It was held that its introduction into evi-

dence as an exhibit was error. In the consideration of the ruling it must be borne in mind that the trial court had admitted evidence that a stomach of a deceased person had been found to contain enough cyanide to cause death. However, the appellate court found this evidence improper for the reason that the stomach whose contents had been analyzed was not identified as that of defendant's wife. The case does not seem to us to have great, if any, analogous features.

The rulings in both of these cases, too, can be supported upon the theory that the exposition of demonstrable things such as a gun, a can of cyanide, or a slug, not identified as the instrument used, is error, because the presence of these sinister things, though not connected in any way with the case, would be likely to produce passion in the minds of the jurors.

*People* v. *Bissert,* 71 App. Div. 118 [75 N. Y. Supp., p. 630, at p. 637]. In this case a policeman was charged with having accepted a bribe from one Lena Schmidt to permit her to conduct a house of ill fame. The Schmidt woman testified that she gave the policeman $550 for the purpose mentioned. As in California, corroboration of an accomplice in a bribery case is necessary and evidence was admitted that Lena Schmidt had drawn $450 from a bank several days before the alleged delivery of the $550 to the policeman. The reviewing court said: "It is not claimed that the defendant (policeman) induced her (Lena Schmidt) to draw this money from the bank, or that it was traced into his possession. Under such circumstances, how can it be said that the fact that she drew this amount of money from the bank tended in the slightest degree to establish that the defendant accepted a bribe, or corroborated the testimony of the witness Schmidt? Had the money drawn from the bank been traced into the defendant's possession, or *had there been established some fact from which that inference could be properly drawn,* then it might be considered by the jury." (Italics ours.) In the instant case the strange coincidence of the defendant's being in San Francisco the day after the payment to the contractors; the appellant's possession of the large sum of *currency* on the very day that the contractors drew a large (commercially,

unusually large) sum of *currency* from the bank; appellant's masquerading under the false name and all of the other mentioned acts indicative of crime supplies these facts from which the inference was properly drawn.

In the Bissert case, the facts or circumstances from which the inference that the policeman had received the money drawn from the bank were attempted to be supplied by evidence that Lena Schmidt had proceeded to furnish her house as though to continue the illegal business confidently. But this was very properly held error, as these acts were acts of the woman and not of the accused policeman. Had the woman been accused of giving the bribe the fact that she proceeded with confidence and furnished her house would undoubtedly have furnished a fact from which an inference could have been drawn, just as the actions of Graves, connected with the other evidence, furnished the facts from which the inference was drawn that the currency withdrawn from the contractor's bank was the currency in Graves' hands in San Francisco.

## II.

*Was the introduction of the appellant's statement before the grand jury error?*

It seems clear to us that the testimony other than the appellant's grand jury statement clearly establishes the *corpus delicti.* It must be borne in mind that the proof of the *corpus delicti* need not be from proof that is sufficiently strong to uphold a conviction of itself. A *prima facie* proof of *corpus delicti* is sufficient. The extrajudicial statement here complained of is but corroborative of the fact that the source of the money or the checks was not legitimate and that in an attempt to conceal such source this public official was driven to the extreme of perjuring himself. It should be borne in mind that in a case of bribery the *corpus delicti* is inextricably mixed with the consideration of guilt of the accused under the evidence. As expressed in Encyclopedia of Evidence (p. 91, vol. 3) : ''Proof of the *corpus delicti* where bribery is charged is the same thing as proof of the defendant's connection with the crime. The one cannot exist without the other.''

### III.

*Was the evidence legally insufficient to establish the corpus delicti?*

Our treatment of point two covers this point as well.

### IV.

*Was the evidence legally insufficient to establish venue?*

█ If the evidence is sufficient to establish that the money was given for the vote of appellant in Los Angeles County on the compromise, a part of the crime was committed there and this fixes the venue.

### V.

*Did the court err in refusing certain instructions on circumstantial evidence?*

The instruction relied upon in the briefs of appellant is as follows: "You are instructed that in order to convict the defendant upon the evidence of circumstances it is necessary not only that all the circumstances concur to show beyond a reasonable doubt that the crime was committed as alleged in the indictment, but that the defendant was the one who committed such crime and that they are inconsistent with any other rational conclusion. It is not sufficient that the circumstances prove, coincide with, account for and therefore render probable the theory sought to be established by the prosecution, but they must exclude to a moral certainty every other theory but the single one of guilt or the jury must find the defendant not guilty."

There can be no doubt but that the refused instruction could properly have been given. The refusal was upon the ground that the points covered were sufficiently covered in other instructions. The other instruction (the one given) in addition to the presumption of innocence is as follows:

"If, upon consideration of the whole case, you are satisfied to a moral certainty, and beyond a reasonable doubt, of the guilt of the defendant you should so find, irrespective of whether such certainty has been produced by direct evidence or by circumstantial evidence, or by a combination of both. The law makes no distinction between circumstantial evidence and direct evidence in the degree of proof required for conviction, but only requires that the jury shall be

satisfied beyond a reasonable doubt by evidence of either the one character or the other, or both.''

It occurs to us, as it did to the trial court in the argument for a new trial, that the jury *could* not have determined, in the face of the presumption of innocence that they were satisfied to a moral certainty, and beyond a reasonable doubt of his guilt as they were instructed they must do to find appellant guilty, and at the same time *could* have considered that the circumstances were consistent with innocence. We have already seen how eminent authority defines ''moral certainty'' and ''reasonable doubt''. ''Reasonable doubt'' is consequent upon, and, in fact, involved in the real meaning of ''moral certainty''. Quoting again from Burrill on Circumstantial Evidence (p. 200): ''The one quality or state of mind implies the absence of the other. . . . So long as moral certainty is not reached a reasonable doubt may be said to remain on the mind. When all reasonable doubt is removed, *moral certainty follows.*'' The point was argued fully in the motion for a new trial and the court, being in a far better position than any appellate court could be, was convinced (and said so) that no prejudice to the defendant (appellant) could have resulted in the premises. We have reviewed all of the court's instructions. They were as simple, plain, direct and understandable to the lay mind as it would seem possible to make them. No less than four or five times the court told the jury that they must determine the issues to a moral certainty and beyond a reasonable doubt against the defendant in the case or he must be acquitted. In view of our analysis of the meaning of the two expressions, and in view of the evidence adduced, we cannot see the possibility that the jury could have arrived at an entirely different conclusion if somewhere in the instructions the court had said that the circumstances must exclude to a moral certainty every other theory but the single one of guilt. After quoting from the Webster case, *supra*, Mr. Wigmore in section 2497 of his treatise observes: ''Many others (definitions of measures of persuasion or reasonable doubt) in varying forms, convey the same notion in more or less well-chosen words. . . . Nevertheless, when anything more than a simple caution and a brief definition is given (the reason for section 1096a, Penal Code) the matter tends to become one

of mere works, and the actual effect upon the jury, instead of being enlightenment, is rather confusion, or, at the least, a continued incomprehension. . . . 'No man can measure with a rule he does not understand; neither can juries determine by rules obscure in themselves and made yet more obscure by attempted definition.' The effort to perpetuate and develop these unserviceable definitions is a useless one, and serves today chiefly to aid the purposes of the tactician. It should be wholly abandoned.''

We have reviewed the whole transcript, not merely the condensed statement in the briefs, and we are convinced beyond any possible doubt that no prejudice to appellant or injustice to him has resulted through any ruling of the trial court. We are firmly convinced that he has had a fair and legal trial and that no reasonable man can acquaint himself with the evidence adduced without being convinced beyond a reasonable doubt and to a moral certainty that the only possible verdict consistent with the evidence was the verdict arrived at by the jury. If any of the points raised, excluding of course that of the statute of limitations and venue, may be determined as error, then we think this case is just such a one as was contemplated by the framers of section 4½ of article VI of the Constitution, in this admirable attempt to prevent the reversals of criminal verdicts on harmless technicalities.

The court's ruling denying the defendant's motion for a new trial is sustained and the judgment is affirmed.

Craig, J., and Archbald, J., *pro tem.*, concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 19, 1934, and the following opinion then rendered thereon:

THE COURT.— In denying said petition we think it appropriate to state that while we are in accord with the District Court of Appeal in its ruling that it was error for the trial court to refuse to give the instruction regarding circumstantial evidence, we are not entirely satisfied that the error was cured by giving the other instructions referred to in said opinion. However, the court in the closing paragraph of its

opinion states that the case is just such a one as is contemplated by the framers of section 4½ of article VI of the Constitution, which provides that no judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice. In our opinion, the evidence in the case points unerringly to the guilt of the defendant. We hardly believe that the verdict of the jury in this case would have been any different had the court given the instruction as to circumstantial evidence. We are of the opinion, therefore, that no miscarriage of justice has resulted from said error and that the court properly refused to reverse the judgment on account of said error.

Preston, J., and Langdon, J., voted for a hearing.