SAM NANFITO v. STATE OF NEBRASKA.

287 N. W. 58

FILED JULY 18, 1939. No. 30463.

*John C. Mullen,* for plaintiff in error.

*Walter R. Johnson, Attorney General,* and *Clarence S. Beck, contra.*

Heard before SIMMONS, C. J., ROSE, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

ROSE, J.

In a prosecution by the state in the district court for Douglas county, Sam Nanfito, defendant, was accused of murder in the first degree, having killed his wife. The specific charge was that, in Douglas county, Nebraska, January 10, 1938, he then and there feloniously, purposely and of his deliberate and premeditated malice shot Santina Nanfito with a revolver and as a result thereof she died January 11, 1938. He pleaded not guilty and upon a trial the jury found him guilty of murder in the second degree. For that felony he was sentenced to the penitentiary for the term of his natural life. As plaintiff in error, defendant presents for review the record of his conviction.

The shooting occurred at the Nanfito home in Omaha. Defendant testified he was cleaning his gun and that the shot was accidental. Santina Nanfito was taken promptly to the Nicholas Senn hospital and was examined there by Dr. N. H. Attwood, who testified she had suffered a gunshot wound in the left chest on a level with the breast; that the bullet passed through her body, went through the stomach, and across the top of the liver, causing a severe hemorrhage therefrom, and lodging beneath the skin; that he removed the bullet; that her death resulted from the gunshot wound.

The principal assignments of error are directed to dying declarations which the trial court admitted in evidence over

the objections of defendant. The declarations contained among other statements the following, in substance: Defendant shot her at 10:30 in the forenoon of January 10, 1938. She was standing by the heating stove in the little room next to the kitchen combing her hair within three or four feet of defendant. Heard a shot and saw defendant with the gun in his hand; had nothing else in his hand; was not cleaning the gun; he helped her into a chair close by and said: "Finally, the day has come," then ran towards his daughter's house; the wife saw him again at a filling station and he said to her in presence of police officers: "Tina, Tina, I really didn't want to do it." Defendant and his wife had previously had trouble; he was jealous of her; she never could understand the reason for jealousy; had frequent quarrels during which he threatened to kill her; would only cost him $200 to get out of it; had six children by defendant; she had never called the police, but her children and neighbors had sometimes done so.

The declarations were made in the form of questions and answers reduced to typewriting and signed by declarant making her mark with the attending physician and nurse as witnesses, the latter holding the pen. Declarant spoke Italian and was not well versed in English. The questions were asked in English by a deputy county attorney, who called to his assistance a capable interpreter of both English and Italian, who was also an assistant in the office of the county attorney. He took an oath as interpreter and translated the questions in English into Italian and directed them to declarant. She replied in Italian and the interpreter translated the questions and answers into English. They were transcribed from shorthand notes into typewriting by the county attorney's secretary and read to declarant and her answers as read were approved by her as correct.

One of the objections to the admission of the declarations in evidence was that no foundation was laid, there being no testimony before the court or jury to show that declarant was conscious of impending death. The admissibility of the evidence was a question of law for the court. *Johnson*

*v. State,* 112 Neb. 530, 199 N. W. 808. The foundation was shown on the face of the exhibit containing the declarations. Asked therein if declarant realized the seriousness of her condition, she answered, "Yes;" replying to other questions she said she did not think she had a chance of life; was prepared to meet her Maker; was a Catholic; had her confession and received Holy Communion; priest had given her the last Sacrament and last Rites of the Catholic Church. The circumstances related evidenced her sense of impending death. The declarations were voluntary. No improper influence was exerted. The rule of evidence applicable has been stated as follows:

"In a prosecution for murder, a statement by the victim of the homicide that he was shot by defendant may be admitted in evidence, if made under a sense of impending death, and the foundation for its admission may be shown by circumstances." *Johnson v. State,* 112 Neb. 530, 199 N. W. 808.

Admissibility of the declarations was also challenged because they were made in a foreign language. They were made in the language familiar to declarant. "Dying declarations may be admissible, although they are given in a foreign language through an interpreter to the person writing them down." 30 C. J. 260.

It is insisted further that declarant was not in a condition to make the declarations, owing to the effect of morphine administered for pain and to treatment for hemorrhages from gunshot wounds. The evidence is clear that, notwithstanding the medicine given, declarant was mentally alert, understood the questions and answered them intelligently under oath. The oath did not make the declarations inadmissible. 30 C. J. 260. They were made under a sense of impending death and the oath was unnecessary. The dying declarations were properly admitted in evidence.

Was the gun accidentally discharged? Defendant so testified, but he left evidence to the contrary. The question was one for the jury. With the gun from which the fatal shot was fired, with a bullet exactly like the one taken from

the body of his wife, and with the dress worn by her at the time, the ballistic expert of the Omaha police department made scientific tests, which, with the powder stain on the dress, showed that the muzzle of the gun was within approximately one inch of the dress when the shot was fired. Defendant's wife was then standing on her feet combing her hair, as already narrated, and the bullet entered her left chest on a level with her breast. That is not the way guns are held while being cleaned and the jury did not believe the defendant's testimony that the shooting was accidental. There is evidence that defendant had recently threatened to kill his wife; that he had violently assaulted her; that he had kicked her and had chased her with a razor. The verdict has abundant support in the evidence.

Rulings in refusing requested instructions and in giving other instructions are assigned as erroneous, but the charge to the jury when considered as a whole, as it should be, does not contain error prejudicial to defendant.

AFFIRMED.

SIMMONS, C. J., dissenting.

I do not agree with the majority opinion in this case. The defendant was charged with murder in the first degree. He was found guilty of murder in the second degree. Murder in the first degree involves a killing "purposely and of deliberate and premeditated malice." Comp. St. 1929, sec. 28-401. Murder in the second degree involves a killing "purposely and maliciously, but without deliberation and premeditation." Comp. St. 1929, sec. 28-402.

Under the evidence received, the defendant was guilty of first degree murder or his defense of an accidental shooting was true. If the defendant murdered his wife purposely and maliciously, he did it "deliberately and of premeditated malice." The evidence shows no quarrels or disagreements, and the alleged dying declaration, hereinafter referred to, positively denies any disagreement, threats, or trouble immediately preceding the shooting. An element of murder in the second degree is that it be "without deliberation and premeditation." This verdict cannot be sustained except

upon the fiction of the law that the greater crime, involving the elements of the lesser crime, permits a conviction of the lesser. But where we are dealing with a person's liberty, we should not sustain a conviction in the face of an absolute want of proof of guilt of the lesser offense. Likewise, a conviction of a felony should not be affirmed where there is reasonable doubt of the admissibility of material and controlling evidence.

The jury's verdict is patently a compromise.

This conviction, to stand at all, depends upon the admissibility of the statements of the deceased made in an alleged dying declaration. The admissibility was challenged. There is an almost unanimous accord in the evidence that the deceased could converse intelligently in the English language. The dying declaration was secured by two assistants to the county attorney. The questions were asked in English, translated into Italian, answered in Italian, and translated into English. The honesty and ability of the interpreter is not questioned. However, where a conviction depends upon the meaning of interpreted language, the declaration should be scrutinized closely; for the words are those of the interpreter, not those of the deceased.

Here the prosecution examined the deceased, and the defendant did not have the opportunity to cross-examine. *He was not present.*

In *Rakes v. People,* 2 Neb. 157, this court said: "When it appears that the deceased, at the time of the declaration which is offered in evidence, had any expectation or hope of recovery, however slight it may have been, and though death actually ensued in an hour afterwards, the declaration is inadmissible." That holding has not been modified.

The rule as to admission of dying declarations is stated in 30 C. J. 255. It is "essential that it be made when he has abandoned *all hope of recovery* from the injury inflicted by accused and is under the firm conviction that his death is inevitable and near at hand. The fact that the declarant believes himself in great danger and entertains a fear that he must die is not sufficient. * * * But according to the clear

preponderance of authority, if deceased had the slightest hope of recovery when the declarations were made they are inadmissible." See, also, 30 C. J. 263.

The opinion recites that Mrs. Nanfito had received the last Rites of the Catholic Church. The only proof of that is found in the declaration itself. More important, however, is the fact that those Rites were administered before she had been told of the seriousness of her condition. The deceased was shot about 10:30 in the morning. She took a turn for the worse about midnight. The county attorney's assistants were called. At that time, the doctor told the patient that "she was getting weaker and that she might die, that her chances of recovery were getting poorer all the time." The nurse testified that she called Mr. Garrotto; that he came about 12:35 a. m. to take the deceased's statement; that the deceased "was told that she *might* die, and that her condition was much worse, and that they wanted a statement;" and that she *was not told anything different thereafter*. She was not told that she was dying.

Was there a conclusive conviction of impending death in the mind of the deceased at the time she was examined by the state's attorneys? She was asked, "Do you realize the seriousness of your condition?" She answered, "Yes." She was asked, "Mrs. Nanfito, have you now given up all hopes of living?" She did not answer that she had, she answered, "I don't think I have any chance because the doctor has taken X-rays. He *knows* better than I do." The X-rays were taken over twelve hours earlier, immediately following the shooting, and long before her condition became serious. She said that the doctor "knows better than I do." He had told her only that she "might die." She was asked, "Mrs. Nanfito, are you now prepared to meet your Maker?" She answered, "Yes, I do. I just had my confession and received Holy Communion." She was then asked, "knowing the *seriousness of your condition*, do you now want to make a statement as to what actually took place on the morning of January 10, 1938?" She replied, "Sure." The statement followed.

At the close, she was asked, "Everything you have told us here is the truth?" She answered, "It was all the truth. No lies. I have just had a confession and I received Holy Communion, and I want to meet my God without a lie." She was asked, "You make this statement * * * knowing the seriousness of your condition?" She answered, "Yes, everything that I said is the truth." This evidence does not conclusively establish that the deceased had given up all hope of living.

However, assuming that the majority opinion is correct in holding that the deceased had abandoned all hope of living, there are other rules of law that must be applied before a dying declaration is admissible in evidence.

"Dying declarations are substitutes for sworn testimony and must yield to the general rules governing the admissibility of evidence. * * * They are restricted to the act of killing and the circumstances immediately attending it and forming part of the *res gestæ*. * * * Dying declarations are not pertinent or relevant to the issue when they deal with distinct and separate transactions." 30 C. J. 272.

"A dying declaration clearly shown to have been actuated by malice, venom, ill will, and desire for revenge should be excluded." 30 C. J. 252. In this statement, the deceased said of her husband: "He says he was jealous of all men;" "he was faking as though he was sorry" "he was terribly jealous of me;" "there wasn't any truth" at all in some of his statements; "he is a liar." She accused him of deserting her and the family. The statement does not show the lack of motive that justifies its admission.

There is also another rule that was violated by the admission of this declaration:

"Declarations tending to show the state of feeling that existed between accused and deceased prior to the homicidal act are *not admissible* in evidence for the prosecution. For example, it is not permissible thus to prove that accused had previously threatened violence to deceased, or any other former and distinct transaction not relating to the particular facts constituting the subject-matter of the charge or the

identification of defendant, from which the jury might infer malice toward deceased." 30 C. J. 277.

The alleged dying declaration included the following: (1) She always watched when he went near the dresser where he kept the revolver; (2) she had had trouble with her husband prior to that day; (3) he was jealous of her from the day they were married; (4) there had been "arguments" "always" before that day, as often as once a week; (5) while specifically denying that he threatened her the day of the shooting, that "before this day" "he always threatened to kill me" "every time we quarreled," "and always said that if he did kill me it would only cost him $200 to get out of it;" (6) he threatened to kill her with a gun "last year;" (7) they had had numerous quarrels in which the police were called; (8) he had been arrested "because he left me and my children and left us without any food."

The majority opinion sets out the following rule from 30 C. J. 260: "Dying declarations may be admissible, although they are given in a foreign language through an interpreter to the person writing them down." I do not disagree with that rule, if it is properly applied. Two cases are cited in the text as authority for the rule. I find no additional cases in the annotations. In the second case cited, the dying declaration is not set out. In the first case, *Commonwealth v. Mika,* 171 Pa. St. 273, 33 Atl. 65, the dying declaration is set out in full in the official state report. It is interesting to note that the trial court in that case excluded parts of the dying declaration which related to the fact that the deceased had given a gun to the accused earlier in the evening prior to the fatal shooting; that the accused "was afraid;" and that the accused and deceased had had "a little trouble" *a week before.* These statements were objected to on the grounds that they related to antecedent matters and were no part of the facts immediately connected with the shooting and were too remote. In the instant case, the trial court admitted *all* of the declaration that fell within that category.

Another principle of criminal law was violated in the admission of this statement. "The state is not entitled to introduce evidence of the bad character or reputation of the accused unless he has clearly and expressly put his character in issue by introducing evidence of good character." 16 C. J. 581. The state offered this statement as a part of its case in chief. In it the defendant was called a liar, a faker, a family deserter, and his arrest, *but not conviction for misdemeanors,* was told to the jury by the admission of the declaration.

Certain of the offensive statements were predicated upon facts never proved by the state as a foundation, such as, "Q. Your husband claims he was cleaning a gun this morning. Did you see him cleaning the gun? A. No; he is a liar." "Q. Did he tell you anything about cleaning his gun at all? A. I knew very well that was what his excuse would be, that he was cleaning his gun, and that he shot me accidentally, but there is no truth at all in it."

"A mere conclusion or expression of opinion or belief by a dying man is not admissible as a dying declaration." 30 C. J. 274.

Disregarding the question of the admissibility of the entire statement, the only statements made in the declaration that were properly admissible under the rule adopted by the majority regarding the shooting are: "He shot me at 10:30;" she told where they were each standing; she saw him with a gun in his hand after she was shot; he was "trying to hide it;" she told him to put it down; she did not see whether his finger was on the trigger; prior to the shooting he had not threatened to harm her; he helped her to a chair and ran to his daughter's house after the shot was fired; that he said, "Finally, the day has come;" and later said, "Tina, Tina, I really didn't want to do it." (This last statement was made in the presence of two officers whom the state did not call to testify.)

The statement, "Finally, the day has come," is an interpretation of something she said to the interpreter. What does it mean? It was not explained. The deceased could

neither read nor write English or Italian. The defendant is a day laborer, an immigrant obviously not well educated. Such people do not ordinarily speak in vague phrases. The inference, wholly unsupported except by old threats, etc., is that this was the day he had looked forward to—the day of her murder.

"All vague and indefinite expressions which do not point distinctly to the *res gestæ* of the fatal occurrence, but require a resort to inference or supposition to establish facts tending to incriminate the accused, should be excluded." 30 C. J. 277.

The other expression, which was uncorroborated by witnesses who could have been called and cross-examined, was, "I really didn't want to do it." It is an interpretation. Had he actually said: "I really didn't mean to do it," it would have been in full accord with his defense of an accidental shooting.

Five witnesses were called to lay a foundation for this alleged dying declaration. Fifty pages of record were consumed by it. The jury must have been impressed by the foundation proof, but only *one of the five witnesses knew* what the deceased was saying to Mr. Garrotto in Italian or what he was saying to her.

The same general principles which I have quoted from Corpus Juris are found in Underhill, Criminal Evidence (4th ed.) secs. 210 to 255; 2 Wigmore, Evidence, secs. 1439 to 1446; and 1 Wharton, Criminal Evidence (11th ed.) secs. 525 to 575.

"The presumption of innocence, which is a presumption both of fact and of law, is founded on the first principles of justice, and is intended, not to protect the guilty, but to prevent, so far as human agencies can, the conviction of an innocent person.". 16 C. J. 535.

A criminal trial must be conducted under such rules as will protect the innocent. 16 C. J. 806.

This conviction cannot stand except upon the basis of this declaration being properly admitted in evidence. That it was prejudicial to the defendant cannot be denied. The

case should be reversed and remanded because of its admission.